Susan L. Burke (D.C. Bar # 414939)
4112 Station Street
Philadelphia, Pennsylvania 19127
Telephone:  (215) 487-6596
Facsimile:  (215) 482-0874

William T. O'Neil (D.C. Bar #426107)
1718 20th Street
Washington, D.C. 20009
Telephone: (202) 232-5504
Facsimile: (202) 232-5513

Daniel L. Abrams
2 Penn Plaza, Suite 1910
New York, New York 10121
Telephone:  (212) 292-5663
Facsimile:  (646) 536-8905

Samuel Z. Yahn
5299 DTC Boulevard, Suite 500
Greenwood Village, Colorado 80111
Telephone: (303) 850-7490
Facsimile: (303) 850-7498

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                                   )
JACK J. GRYNBERG and RSM PRODUCTION                                )
CORPORATION (5299 DTC Boulevard, Suite 500,                        )
Greenwood Village, Colorado),                                      )
                                                                   )
                                    Plaintiffs,                    )
                                                                   )
            -and-                                                  )
                                                                   )
ÉLIE DOTÉ, FRANÇOIS BOZIZÉ YANGOUVONDA,                            )
SYLVAIN N'DOUTINGAI, EMMANUEL TOUABOY,                             )
EARL CHERRY, and JOHN DOES 1-10,                                   )
                                                                   )
                                    Defendants.                    )
                                                                   )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**<u>COMPLAINT AND JURY DEMAND</u>**

The Plaintiffs, Jack J. Grynberg and RSM Production Corporation, a Texas corporation, collectively referred to herein as "RSM," through their undersigned counsel and for their Complaint against Defendants, respectfully allege as follows:

## I.   THE PARTIES AND JURISDICTION

1.     Jack J. Grynberg is 75 years old.  He is president and CEO of RSM.  Grynberg is a citizen of the United States and of the State of Colorado.  He is a graduate and a trustee emeritus of the Colorado School of Mines.  Grynberg has been actively involved in oil and natural gas research, exploration, development and production for more than fifty (50) years and is responsible for numerous oil and natural gas field discoveries and extensions in the United States and overseas.  He is a Registered Professional Engineer in good standing in the States of Colorado, South Dakota, Oklahoma and Texas, is a member of many professional and trade associations, author of numerous publications and holder of a U.S. patent for the application of laser beams for the continuous detection and identification of hydrocarbons in the mud stream coming out of a bore hole while drilling.  He was appointed by President Ford and reappointed by President Carter to the Committee on Nuclear and Alternate Energy of the National Academy of Sciences.  He was appointed by President Clinton to participate in the presidential mission to Russia in March 1994 headed by the late Secretary of Commerce Ron Brown representing the United States oil and gas industry.  He has been a speaker at the 5th, 6th and 7th United Nations sponsored conference on African Oil, Gas and Finance, where he represented the United States at the 7th conference.  For the past several years he has been a speaker at oil and natural gas international conferences in London, England, Cape Town, South Africa, Rio de Janeiro, Brazil, Houston, Texas, Lille, France, and Hamburg, Germany.  At all

times material to this Complaint, Grynberg also has been the President and CEO of RSM, and has acted within the scope of his executive authority.

2.      RSM is a Texas corporation that maintains its principal place of business in Arapahoe County, State of Colorado.

3.      At all times pertinent to this Complaint, Françoise Bozizé Yangouvonda ("Bozizé"), was a military advisor to Central African Republic ("CAR") President Ange-Félix Patassé ("Patassé"), succeeding him to become President of CAR following a military coup in March 2003.  Defendant Élie Doté ("Doté"; "Prime Minister") is the current Prime Minister of the Central African Republic and a Canadian Citizen. Defendant Sylvain N'doutingai ("N'Doutingai"; "Minister") is the current Minister of Mines and Energy, and recently appointed Minister of Finance.  All three (3) are located in Bangui, CAR. Defendant Emmanuel Touaboy, has, at all times, been CAR's Ambassador to the United States.  The embassy for the Central African Republic in the United States is located at 1618 22nd Street, NW, Washington DC 20008.

4.      At all times pertinent to this Complaint, Earl Cherry was a United States citizen, and upon information and belief a citizen of Louisiana.  Cherry is the owner of Cherry Air Aviation Service, 8228 Highway 71 South, Lecompte, Louisiana 71346-4704.

5.      This Court has appropriate jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00 and the action is brought by citizens of this country against the Defendants listed, both jointly and severally.  In addition, jurisdiction with regards to Defendants with the exception of Earl Cherry is predicated on the Foreign Sovereign Immunities Act.

6.    Venue is appropriate pursuant to 28 U.S.C. 1391(f).  Venue is appropriate in the alternative pursuant to 28 U.S.C. 1391(d).

7.    At all times material hereto, actions taking place outside the United States were directed at domiciliaries of the United States, causing a "direct effect" in the United States, as explained more fully below.

8.    This action is not precluded by the operation of the Foreign Sovereign Immunity Act of 1976 (FSIA) 28 U.S.C. §§ 1330, 1602 et seq. In issuing a "concession" rather than "license," the former government of President Ange-Félix Patassé was intentionally operating under the "commercial activity" exception of FSIA, since a concession indicates the intention to privatize the country's national resources. Courts considering similar transactions by foreign officials have uniformly held that such conduct is "commercial" within the meaning of the FSIA's commercial activity exception.  See _Daventree Ltd. v. Azerbaijan_, 349 F.Supp2d 736, 748 (S.D.N.Y. 2004) (Azeri's solicitations in furtherance of stated intention to privatize state-run oil company by seeking foreign investors to purchase privatization vouchers is "commercial activity" within the meaning of the FSIA, as is the subsequent decision not to privatize the oil company); _WMW Mach., Inc. v. Werkzeugmaschinenhandel GMBH,_ 960 F. Supp. 734, 737-41 (S.D.N.Y. 1997) (tortious interference claim arising out of East Germany's efforts to privatize state assets can move forward based on "commercial activity" exception); _Ampac Group Inc. v. Republic of Honduras,_ 797 F. Supp. 973, 976-77 (S.D. Fla. 1992).

9.     Any additional factors in this Complaint arguably supporting immunity under the FSIA are excluded from FSIA immunity because of their wholly commercial nature, insofar as they serve not traditional purposes of government but rather proprietary enterprises

outside its territory through entities which need not necessarily be regarded as basic

departments of government. The successor government of President Françoise Bozizé, and its

principal actors, including, but not limited to, Prime Minister Élie Doté, and Minister of Mines

and Energy Sylvain N'Doutingai, have (a) barred RSM from having physical access to the

concession, (b) sought outside brokers to sell the concession to outsiders, and (c) upon

information and belief invited strangers to the concession agreement, i.e., outside corporations

and foreign nationals, to bid on the concession, in spite of RSM's exclusivity. When an action

outside the territory of the United States in connection with a commercial activity of the

foreign state elsewhere causes a direct effect in the United States, in this case, interference,

obstruction and bad faith with regard to the valid and exclusive concession issued under the

previous CAR government to RSM, those  actions must be considered "in connection" with

commercial activity for purposes of the third clause of Section 1605(a)(2), when there is a

"substantive connection" or a "causal link" between those actions and the commercial activity.

*Hanil Bank v. PT. Bank Negara Indonesia,* 148 F.3d 127, 131 (2d Cir. 1998). An effect is

"direct" "if it follows as an immediate consequence of the defendant's ... activity" overseas. Id.

(quoting *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 618 (1992)). *Alternatively,* a

direct effect is felt in the United States when "legally significant acts giving rise to the claim"

occur in the United States. *Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 152 (2d Cir.

1991), *aff'd on other grounds,* 504 U.S. 607 (1992). *See also Hanil Bank,* 148 F.3d at 133.

## II.    GENERAL ALLEGATIONS

10.    RSM is an independent, innovative international oil and natural gas exploration,

development and production company. Over the years, RSM's President and CEO, Jack J.

Grynberg, has had, and continues to have, extensive experience and business dealings in the African continent, including CAR, Cameroon, Senegal, Mauritania and Mozambique.

11.    Throughout the 1980s-90s, RSM, and Grynberg personally, spent considerable time, resources and professional effort searching for oil and natural gas potential throughout Central and West Africa, in the present concession area located in the northern sector of CAR, adjacent to the producing oil fields in southern Chad now connected to the Atlantic coast of Cameroon through a 1,066-kilometer pipeline, partially financed by the World Bank.

12.    RSM, and Grynberg personally, also expended time, resources and professional effort in meeting with CAR Government officials. In December 1999 the then-Minister of Energy, Mines and Hydraulics, Andre Letou (now deceased), traveled to Denver, Colorado to meet with RSM's representative, and Grynberg personally, to discuss the feasibility of a concession agreement. Minister Letou's travel expenses were shared by the U.S. State Department and RSM. Minister Letou stated the Treasury was empty; that CAR wished to bring private developers into the country to invest in its abundant natural resources; and that this would improve its present dire economic condition. The landlocked former French colony of CAR is one of the most impoverished nations in the world. Minister Letou stressed the urgency of his country's economic condition, and the importance of proceeding with all due haste in developing its natural resources.

13.    On December 17, 1999, RSM obtained Minister Letou's promise and approval of an exclusive concession for the exploration, development, exploitation and production of oil and natural gas in an area comprising a total of 14,500,000 acres in the north of CAR bordering Chad. The CAR Government at this time had been elected in UN-supervised elections. The

President was Ange-Félix Patassé, a democratically elected head of state. In approving the RSM concession on December 17, 1999, Minister Letou's self-expressed intent was to privatize the energy sector and rapidly increase his country's liquidity, with the distribution of concessions, which are subject to royalties and taxes, rather than production sharing agreements, which require large expenditures of public monies from the Treasury.

14.    The exclusive concession agreement RSM negotiated with Minister Letou was ratified by Decree by the President and Council of Ministers on November 24, 2000. RSM then proceeded with all due haste by negotiating with Exxon, Conoco and Encana to obtain valuable seismic, well testing, and well log information for areas in and around the concession area:

- RSM traded with Conoco to obtain its seismic data in northern CAR in return for RSM's seismic data in certain Caribbean areas including St. Lucia, St. Vincent in the Grenadines, Martinique and Guadeloupe;

- RSM traded with Exxon to obtain seismic data in northern CAR in return for RSM's seismic data certain Caribbean areas including St. Lucia, St. Vincent in the Grenadines, Martinique and Guadeloupe, plus $10,000.00 for copying costs;

- RSM also traded with Exxon for well log data Exxon had drilled in northern CAR in 1984, as well as all well logs and well completion data;

- RSM traded with Encana 400 kilometers of seismics in directly adjacent Chad wells, plus on oil discovery well logs drill in Southern Chad adjacent to RSM's concession included in the test data.

15.    As of 2002, RSM was able to obtain a total of 3,600 kilometers of seismic data

from Conoco and Exxon, which, combined with Encana's 400 kilometers, amounted to 4,000 kilometers. This data required extensive reprocessing of aging, highly water damaged magnetic tapes. Restoration and reprocessing costs alone were in excess of $700,000.00, notwithstanding the value of seismic data taken from the Caribbean in these transactions. By today's standard of $5,500.00 per kilometer, present value of these seismic data is $22 million. An additional 2,700 kilometers (nearest to the Chad side where the pipeline to the Atlantic Ocean is located) must be shot before further drilling. United Reef, Ltd. maintains an option to finance 50% of this cost based on RSM's contributions of its 4,000 kilometers of seismic data. The value brought to CAR by RSM's post-2000 efforts to secure seismic data and financing is enormous. It is an economic opportunity that is being forfeited by the actions of individuals both inside and outside the CAR Government as described below.

16.     Commencing in May 2001, CAR had begun its descent into civil war. It soon became impossible for foreigners to enter any areas outside the capital city of Bangui, including the northern sector in which the subject 55,000 square kilometer concession is located.

17.     Article 4 of the Concession Agreement required seismic work to commence in 2003. Potential contractors, such as CGG (France) and Western Geophysical (USA), declined to allow their employees to enter CAR citing their concerns for personal safety. Indeed, shortly after the issuance of the concession, the Patassé government informed RSM it must deny access to the Concession area until the civil unrest ended.

18.     President Patassé was overthrown by a coup, on March 15, 2003, led by now-President, General Françoise Bozizé. The coup happened while Patassé was out of the country.

General Bozizé was Patassé's most trusted military advisor.

19.     On April 22, 2003, one month after the coup, RSM gave notice to the new Government of Bozizé that it was invoking Article 28 of the Concession Agreement, initiating force majeure.  The fighting and atrocities in the northern sector had become vastly worse; following the coup, paramilitary forces loyal to Patassé were retreating to the northern sector. The banditry and brigandage in this section was on the upswing due to unpaid mercenary forces, formerly employed by Bozizé in the coup d'etat, remaining in the area rather than returning to their neighboring countries. The force majeure was ratified by the newly installed Minister of Energy, Mines and Hydraulics, Commander Sylvain N'Doutingai, the President's nephew, on November 12, 2003.

20.     National elections were held on March 2005. Patassé was enjoined by an indigenous court from appearing in that election. Patassé was accused by coup leaders (the ruling party) of having stolen 70 Billion Central African francs (XAF), approximately $129.5 million, from the CAR treasury. Patassé has strenuously denied this and no judgments or convictions to date have been issued. Bozizé was thus officially elected President.

21.     Throughout this period, and pursuant to Art. 29 of the Concession Agreement, RSM had initiated numerous face-to-face meetings and communications between representatives of RSM and the CAR Government, in order to create a new workscope and resume operations:

- During the week of February 22, 2004, RSM's representative, Michael D. Coulter, met in Bangui with Minister N'Doutingai, and senior officials of the Ministry, including the Ministry's legal advisor, at N'Doutingai's request.

9

- During the week of April 29, 2004, at the Seventh UN Oil, Gas and Finance Conference, in Marrakesh, Morocco, RSM's President and CEO, Jack J. Grynberg, met with various representatives of the Ministry.

- During the week of October 24, 2004, RSM representative Michael D. Coulter again met in Bangui with senior Ministry officials, including the Ministry's legal advisor, to follow up on meetings and submissions made earlier in the year.

- By letter dated December 7, 2004, President and CEO Jack J. Grynberg addressed concerns as to the lack of progress on the settlement of force majeure issues to President Bozizé.

22.    Despite these attempts to resolve delays arising from the force majeure, no resolutions were offered or accepted by the Government.  Minister N'Doutingai, on information and belief, was, in fact, simultaneously approaching potential bidders under the mistaken belief (and yet with the apparent approval of the President) that the Concession Agreement would simply be voidable as a result of the force majeure and the passage of five (5) years as of November 2005.

23.    On information and belief, in January 2005, N'Doutingai invited Fu Changsheng, Deputy Manager for Africa, China National Petroleum Corporation ("CNPC"), to Bangui, and offered to "sell" CNPC an exclusive concession (and proprietary data belonging to RSM) in the same area held exclusively by RSM, without first informing RSM.  N'Doutingai, moreover, was reported in *African Energy Intelligence* in August 2005 as having hired a South African broker in the attempt to sell off the concession following the supposed expiration date

of November 24, 2005.

24.     Following the election, the Bozizé Government increasingly refused to return telephone calls or correspondence initiated by RSM regarding the concession agreement. On July 1, 2005, Mr. James Panos, Chargé d'Affaires of the U.S. Embassy in CAR, hand-delivered to the Minister, on RSM's behalf, a letter dated June 21, 2005 and a comprehensive Summary Report and Proposed Annual Work Program ("Summary Report") in French dated May 2005, summarizing issues which had not been resolved following meetings between RSM representatives and the Ministry in February, April and October 2004, or addressed in unanswered correspondence to the Minister and Ministry. This hand-delivered letter requested that the Minister advise RSM as soon as possible of a date to meet with him and other Government officials in CAR. The purpose was to return to operations as soon as possible, consistent with the goals of the Concession Agreement. RSM had not been made aware of the Government's erroneous view that the concession might end on November 24, 2005, which in fact should have been November 24, 2010. This Summary Report had, in fact, been prepared at the specific request of the Ministry. On June 23, 2005, Mr. Panos also hand-delivered a copy of the Summary Report to Prime Minister Elie Doté.

25.     No reply was given by the CAR Government. It was apparent that the Government had lost all urgency as to this concession and the development of natural resources to increase funds in the Treasury vis-à-vis jump starting the economy.

26.     RSM once again sent representatives to Bangui to meet with the Minister, the Prime Minister Elie Doté and President Françoise Bozizé, the week of August 14-21, 2005.

27.     Following meetings between RSM representatives and the Prime Minister and

the Minister on August 16, and RSM and the Prime Minister on August 19 and 20, 2005, it

became obvious that neither the Ministry nor the Government would honor its obligations

pursuant to the Concession Agreement, owing to the newly stated belief that the Concession

Agreement would expire on November 24, 2005.

28.    RSM's representatives, which included RSM's Vice President and General

Counsel, Samuel Yahn, Esq., were accompanied by a seven-member crew of geophysical

scientists and engineers simultaneously flown in from Ukraine. On August 20, RSM's

representatives formally represented to the Prime Minister that the crew was ready and able to

travel to the concession area to fly in the necessary geophysical equipment and to commence

the seismic survey work and that RSM would cover the costs of armed combat troops furnished

by the Army to accompany and protect the seismologists and their equipment. That offer was

rejected out of hand by the Prime Minister. The Prime Minister specifically forbade any entry

into the concession area by RSM's seismologists, thus putting an end to all discussions of the

Summary Report and proposed Work Program as of August 20, 2005.

29.    In rejecting the request to gain access to the concession area the Prime Minister

informed RSM's representatives, with U.S. Chargé d'Affaires James Panos present, that the

Government intended to take up the question as to whether the Concession Agreement was

even "legal."  Questions as to the legality of the Concession Agreement had never been raised

throughout numerous meetings and communiqués. The prior President and Council of

Ministers had approved of the Concession Agreement on November 24, 2000. It was therefore

on August 20, 2005 that it became clear that the excessive delays under the present

Government were due not to unresolved issues as to force majeure but to conscious and

12

deliberate efforts by the Bozizé Government to block, obstruct or otherwise interfere with the valid exclusive Concession Agreement simply because it had been issued by the previous Government.

30.    A further explanation, ending any hope of resolving purely force majeure matters, was offered by the Prime Minister at the August 20 meeting. The Prime Minister alleged the International Monetary Fund (IMF) was demanding all public contracts meet new standards of "transparency"; due to this requirement, RSM's 1999 Concession Agreement, according to the Prime Minister, would be reevaluated by the Government for lack of transparency, but only following the so-called "termination" of the Concession on November 24, 2005, owing to the fictitious and non-existent five (5) year expiration clause allegedly discovered in the Agreement.

31.    In the period since these declarations of avoidance by the Prime Minister, on information and belief, no "transparency" review by the Government has ever taken place; nor were the Prime Minister's claims, of either a five (5) year expiration or IMF "transparency" review, to be supported by any documentation, law, resolution or court decision. RSM's representatives learned of the professed November 24 "termination" for the first time at the very conclusion of the August 20 meeting, one day prior to their departure from the country.

32.    By letter dated September 6, 2005, RSM requested that the Minister confirm the validity of RSM's Concession Agreement as extended for the duration of the force majeure event within seven (7) days of the receipt of the letter. RSM received no response.

33.    On September 14, 2005, Jack J. Grynberg, President and CEO of RSM, met with President Françoise Bozizé and Jean-Paul N'Goupandé, Minister of Foreign Affairs of

CAR, in the presence of Ambassador Touaboy, in New York, for one hour and forty-five minutes to directly advise the President of the lack of progress on the Concession Agreement and to answer questions regarding RSM posed by the President.

34.    On September 26, 2005, Mr. Michael D. Coulter, President, CEO and Director of United Reef, Ltd., RSM's partner in CAR, met with Prime Minister Doté, then-Minister of Finance and Budget Théodore Dabanga, in the presence of Ambassador Touaboy, at the Hamilton Crowne Plaza Hotel in Washington, D.C., 14th and K Streets, to discuss the RSM project and lack of communication by CAR.

35.    RSM's French legal counsel, Mr. Philippe Auzas, Grand, Auzas & Associes, 6, Rue Paul Valery, 75116 Paris, France, met with Prime Minister Doté in Paris, France at the Hotel Meridien, Montparnasse at 12:00 noon on September 30, 2005. This meeting was arranged by the Director of Protocol for the Prime Minister, who also attended. At this one hour meeting Mr. Auzas again requested permission to allow a seismic crew into the country.

36.    Despite all these attempts to resolve force majeure issues amicably and at no cost to the Government or the People of CAR, no reply was ever given by the CAR Government on the force majeure issue other than that the Concession Agreement would be terminated on November 24, 2005.

37.    RSM requested that an expertise procedure be instituted pursuant to the Concession Agreement, given an unresolved matter material to operation of the Concession Agreement. The CAR Government again refused to reply, or cooperate.

38.    In late September 2005 Ambassador Touaboy, claiming to be acting on behalf of Minister N'Doutingai, demanded RSM's extremely valuable, proprietary 4,000 kilometer

(geophysical) survey information, together with magnetic tapes of seismic processing, showing

where oil and/or natural gas is to be found in the north of CAR, from Mr. Grynberg. These

"trade secrets" were valued in excess of $22 million, and yet Touaboy also had the temerity to

demand from Mr. Grynberg a substantial monetary payment before President Bozizé or

Minister N'Doutingai would resolve the "issue" with RSM. Grynberg categorically refused

both requests as violating United States laws.

39.     In early 2006 RSM brought the matter before the International Chamber of

Commerce (ICC) pursuant to the Concession Agreement. The ICC appointed a very eminent

and competent arbitrator. CAR, in bad faith, refused to pay the required €13000 fee and

furnished a letter to ICC stating they did not recognize this august body. The ICC thereupon

issued default judgment for RSM.

40.     On May 8, 2006, RSM sent a letter to President Bozizé, in a further attempt to

resolve the situation.  A meeting was then organized by U.S. Charge d' Affaires James Panos

in New York on June 2, 2006, between President Bozizé, Ambassador Touaboy, Jack J.

Grynberg, and Philippe Auzas, who was flown in from Paris specifically for this meeting.

During the meeting assurances were given by President Bozizé that the matter should soon be

resolved by President Bozizé personally in RSM's favor.

41.     President Bozizé also pleaded with RSM's representatives, to refrain from

taking CAR and its government officials to court. He specifically described both the

Arbitration as well as any litigation as being undesirable for CAR. In return President Bozizé

promised he personally will resolve all force majeure issues, acknowledging that it was only

our right, not CAR's, to continue the exploration, development and production in northern

CAR for the benefit of his people.

42.    On July 12, 2006, Mr. Auzas nevertheless received a fax from the Minister appointing Mr. Emile Bizon, a CAR attorney, and Mr. Ken Mildwaters, and English attorney, as representatives of the CAR Government in all future matters.  Both Mr. Mildwaters and Mr. Bizon met with Mr. Auzas in Paris on July 26, 2006, presenting RSM with a "standstill agreement" as a condition precedent to for the negotiation of the matter.  That proposed agreement contained superfluous and unusual provisions having nothing to do with the force majeure and was rejected by RSM as both infringing upon and rescinding RSM's unequivocal rights under the Concession Agreement.  Furthermore, Mr. Mildwaters simultaneously represented a British oil company with whom RSM was negotiating a partial farm in to the CAR concession.  Mr. Mildwaters' involvement as see CAR's representative was regarded as a conflict and an anomaly.  CAR nevertheless refused to withdraw Mr. Mildwater.

43.    In February 2007 RSM filed an application with the International Centre for Settlement of Investment Disputes (ICSID). Again, CAR refused to respond and missed its deadline. ICSID asked RSM to nominate its representative as well as the president of the tribunal which RSM did. At the end of May 2007 CAR suddenly asked for an extension to June 18, 2007, to nominate its member of the tribunal, to which RSM has agreed.

44.    RSM has contacted ICSID calling to ICSID's attention that the concession contract between RSM and CAR required a process to go to the International Chamber of Commerce in Paris first before applying to ICSID.  A process which RSM performed and CAR refused.  It is the opinion of RSM that CAR no longer has standing in front of ICSID, and a decision on this issue from ICSID is in the process of being rendered.

45.     Owing to these delays, and to the belief that Plaintiffs' tortious interference causes of action against the Defendants accrued on August 20, 2005, when they were first informed of CAR's intention to void the Concession Agreement, the two-year statute of limitations for Colorado tortious interference claims dictates that any civil action be filed immediately.

46.     Further irregularities supporting Plaintiffs' theories of tortious interference have occurred and continue to occur: Prior to the original November 24, 2000 Decree, Jack J. Grynberg was contacted in person in Washington D.C. by CAR's U.S. Ambassador Emmanuel Touaboy (who claimed to be acting on behalf of President Patassé's brother, Réne Kofi), to solicit a $2 million pay-off to ensure passage of the Decree. It took the former Deputy Secretary of State, the Honorable Thomas Pickering, to inform President Patassé of the possible violation of the U.S. Foreign Corrupt Practices Act, to ward off this potential "shakedown." Touaboy is one of the few holdovers from the Patassé Government. He has participated extensively in the bad faith negotiations following his Government's ratification of force majeure.

47.     On October 25, 2006, Mr. Grynberg received a telephone call from Earl Cherry, owner of Cherry Air Aviation Service, 8228 Highway 71 South, Lecompte, Louisiana 71346-4704. Mr Cherry informed Mr. Grynberg that he has been doing business with CAR. Mr. Cherry stated that he had helped CAR buy a used C130 plane and his pilots and mechanics were operating it on behalf of CAR. The plane was sitting idle on the tarmac in Bangui and he was looking for business. Mr. Cherry stated that he was dealing directly with President Bozizé and Ambassador Touaboy. When Mr. Grynberg averred that he was having problems with the

CAR Government, and that as an American he could not offer bribes, Mr. Cherry offered to help, adding, "You don't have to bribe.  Cherry Aviation Air Service will send you a bill for the charger services and I will increase the bill by the amount of money to be added for President Bozizé personally.  You want to move your equipment to your area in the CAR and I will handle the payment of the difference between the actual air bill and the extra directly to them."  According to Mr. Cherry, "them" was President Bozizé and Ambassador Touaboy. Mr. Cherry gave an example of an item for $150,000: "They told me to increase the bill by $25,000 and they got the $25,000."  Mr. Grynberg refused the offer.

48.    On June 18, 2007, Mr. Grynberg testified in front of another ICSID tribunal dealing with a dispute involving an offshore Grenada license.  During Grynberg's testimony Brian King of the British Law firm called Freshfields began questioning Grynberg about CAR. Grynberg's British attorney asked Mr. King if he and Freshfields now represented CAR in front of ICSID as well.  Mr. King stated that they did.

49.    Following independent investigation Mr. Grynberg obtained evidence that the legal costs of approximately $4.4 million for Grenada were being paid by a group that includes Len Blavatnik and Mikhail Fridman. Moreover, Michael Melnicke, in late 2005, approached Grynberg under the pretense that he was a serious investor interested in the CAR.  He obtained from RSM and Grynberg the valuable and confidential geophysical and economic study on the oil potential of the CAR, as a potential investor with RSM in the CAR. This material was never returned despite numerous requests. Subsequent to the provision of this material, Melnicke injected himself into negotiations between RSM and the Government of Grenada, and attempted to negotiate an "overriding royalty" (i.e. income from gross oil and natural gas

production) by RSM to Melnicke which, on information and belief, was designed as a vehicle in which to bribe the Grenadian Government.  Mr. Melnicke is an "Ambassador at Large" to the Government of Grenada, a position similar to that previously held by convicted fraudster Eric Resteiner and Viktor Kozeny, another well-known international con man.  Moreover, Brian King and Jan Paulssen are partners at the Freshfields Law Firm, and they have possibly been paid by Melnicke or John Does (e.g., people to whom Melnicke has improperly shared the information), in order to obtain unfair advantage with the CAR Government.  If Melnicke or anyone working with Melnicke were subsidizing CAR's legal costs it would be to obtain unfair advantage and constitute champerty, adding further evidence of tortious interference and unlawful conspiracy.

### FIRST CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT

50.     Plaintiffs fully incorporate by reference those allegations contained in paragraphs 1-49 above, as though fully set forth herein.

51.     Defendants have intentionally and improperly interfered with Plaintiff's exclusive concession agreement with the CAR, and Plaintiff's prospective business advantages arising out of the issuance of access to an oil and natural gas exploration, development and production exclusive concession agreement with RSM in the CAR.

52.     RSM has complied fully with its obligations pursuant to the exclusive concession agreement.  The Defendants' actions have prevented Plaintiffs from developing substantial oil reserves in the CAR.

53.     The Plaintiffs have invested over $20,000,000.00 to date in this politically risky area and have 4,000 kilometers of newly reprocessed 2-D seismic comprising over 60 drillable

prospects for oil. RSM wishes to conduct an additional 2,700 kilometers of seismic over the area closest to the existing Southern Chad pipeline to Kribi, Cameroon on the Atlantic coast, an available international market.

54.    Defendants have acted unconscionably and in bad faith by delay, interference, obstruction, false assertions of "color of law" concerning the legality and transparency of the concession agreement, and by refusing to honor dispute settlement procedures found therein.

55.    Plaintiffs have obtained a default judgment in the prescribed dispute settlement arena, owing to the intransigence of the CAR-affiliated Defendants herein, yet Defendants continue to interfere with and obstruct operations.

56.    The Defendants consented to the force majeure in bad faith, with the intention of employing it as a device to void the concession, even as their unpaid mercenaries in the concession area made it impossible for Plaintiffs to operate with military support by the Defendants.

57.    Plaintiffs have been approached by Defendants or their agents for under the table payments too many times for it to constitute an anomaly. The fundamental approach of a concession agreement, offered by the previous CAR Government, has been replaced under the present Government with unfair conditions never contemplated and amounting to an attempted takeover and solicitation for bribes.

58.    But for the improper interference, CAR would be honoring the concession agreement, and RSM would be able to explore and develop the region and through its efforts reap a very substantial profit.  Damages are to be determined at trial.

## SECOND CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS

59.    Plaintiffs fully incorporate by reference those allegations contained in paragraphs 1-58 above, as though fully set forth herein.

60.    Defendants have intentionally and improperly interfered with RSM's exclusive concession agreement with the CAR, and Plaintiffs' prospective business advantages arising out of the issuance of access to an oil and natural gas exploration, development and production exclusive concession agreement by RSM in the CAR.  Plaintiffs had a reasonable expectation that this relationship would continue absent the improper interference.

61.    But for the improper interference, CAR would be honoring the concession agreement, and RSM would be able to explore, develop and produce oil in the region and through its efforts reap a profit in an amount to be determined at trial.

62.    Wrongful means include seeking improper bribe payments.

## THIRD CAUSE OF ACTION – CIVIL CONSPIRACY

63.    Plaintiff fully incorporates by reference those allegations contained in paragraphs 1-62 above, as though fully set forth herein.

64.    Upon information and belief, each of the defendants herein were participants with each other and quite possibly additional not-yet-known individuals or entities, in an illegal, criminal conspiracy.  The common purpose of this conspiracy was to divert extremely valuable American petroleum rights that rightfully belong to RSM, a Texas Corporation, to another group of individuals or companies.

65.    Each defendant understood this common purpose.

66.    Unlawful overt acts included solicitations of bribes in violation of the Foreign

Corrupt Practices Act.

67.     As a proximate result of the civil conspiracy alleged herein, RSM has been

damaged in an amount to be determined at trial.  Each defendant herein is jointly and severally

liable for all damages.

WHEREFORE, plaintiffs claim for judgment against Defendants, jointly and severally such

that each is potentially liable to plaintiffs for the entire damage award for the first three causes of

action, in an amount to be determined at trial but exceeding $75,000, for costs and expenses,

attorney fees, punitive damages, interest, and for such further and other relief as may be ordered by

this Court.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE BY A
DULY CONSTITUTED JURY.**

Dated: August 17, 2007.

Respectfully submitted,


_____/s/_____
Susan L. Burke (D.C. Bar # 414939)
Burke O'Neil LLC
4112 Station Street
Philadelphia, Pennsylvania 19127
Telephone: (215) 487-6596
Facsimile: (215) 487-0874

William T. O'Neil (D.C. Bar #426107)
1718 20th Street
Washington, D.C. 20009
Telephone: (202) 232-5504
Facsimile: (202) 232-5513

Daniel L. Abrams
2 Penn Plaza, Suite 1910
New York, New York 10121
Telephone:  (212) 292-5663
Facsimile:  (646) 536-8905

Samuel Z. Yahn
5299 DTC Boulevard, Suite 500
Greenwood Village, CO  80111
Telephone:  (303) 850-7490
Facsimile:  (303) 850-7498

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| | |
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>**(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>**(IN U.S. PLAINTIFF CASES ONLY)**<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

1 U.S. Government
  Plaintiff

2 U.S. Government
  Defendant

3 Federal Question
  (U.S. Government Not a Party)

4 Diversity
  (Indicate Citizenship of
  Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| A. *Antitrust* | B. *Personal Injury/ Malpractice* | C. *Administrative Agency Review* | D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | 310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Medical Malpractice<br>365 Product Liability<br>368 Asbestos Product Liability | 151 Medicare Act<br><br>Social Security:<br>861 HIA ((1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g)<br>864 SSID Title XVI<br>865 RSI (405(g)<br>Other Statutes<br>891 Agricultural Acts<br>892 Economic Stabilization Act<br>893 Environmental Matters<br>894 Energy Allocation Act<br>890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| E. *General Civil (Other)* | OR | | F. *Pro Se General Civil* |
|---|---|---|---|
| **Real Property**<br>210 Land Condemnation<br>220 Foreclosure<br>230 Rent, Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property<br><br>**Personal Property**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | **Bankruptcy**<br>422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>535 Death Penalty<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br><br>**Property Rights**<br>820 Copyrights<br>830 Patent<br>840 Trademark<br><br>**Federal Tax Suits**<br>870 Taxes (US plaintiff or defendant<br>871 IRS-Third Party 26 USC  7609 | **Forfeiture/Penalty**<br>610 Agriculture<br>620 Other Food &Drug<br>625 Drug Related Seizure of Property 21 USC 881<br>630 Liquor Laws<br>640 RR & Truck<br>650 Airline Regs<br>660 Occupational Safety/Health<br>690 Other<br><br>**Other Statutes**<br>400 State Reapportionment<br>430 Banks & Banking<br>450 Commerce/ICC Rates/etc.<br>460 Deportation | 470 Racketeer Influenced & Corrupt Organizations<br>480 Consumer Credit<br>490 Cable/Satellite TV<br>810 Selective Service<br>850 Securities/Commodities/ Exchange<br>875 Customer Challenge 12 USC 3410<br>900 Appeal of fee determination under equal access to Justice<br>950 Constitutionality of State Statutes<br>890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| 530 Habeas Corpus-General<br>510 Motion/Vacate Sentence | 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | 895 Freedom of Information Act<br>890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| 710 Fair Labor Standards Act<br>720 Labor/Mgmt. Relations<br>730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>740 Labor Railway Act<br>790 Other Labor Litigation<br>791 Empl. Ret. Inc. Security Act | 441 Voting (if not Voting Rights<br>Act)<br>443 Housing/Accommodations<br>444 Welfare<br>440 Other Civil Rights<br>445 American w/Disabilities-<br>Employment<br>446 Americans w/Disabilities-<br>Other | 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment &<br>Enforcement of Judgment<br>153 Recovery of Overpayment of<br>Veteran's Benefits<br>160 Stockholder's Suits<br>190 Other Contracts<br>195 Contract Product Liability<br>196 Franchise | 441 Civil Rights-Voting<br>(if Voting Rights Act) |

## V. ORIGIN

| 1 Original<br>Proceeding | 2 Removed<br>from State<br>Court | 3 Remanded from<br>Appellate Court | 4 Reinstated<br>or Reopened | 5 Transferred from<br>another district<br>(specify) | 6 Multi district<br>Litigation | 7 Appeal to<br>District Judge<br>from Mag. Judge |
|---|---|---|---|---|---|---|

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

| VII. REQUESTED IN COMPLAINT | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES        NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instruction) | YES | NO | If yes, please complete related case form. |
|---|---|---|---|---|

DATE                    SIGNATURE OF ATTORNEY OF RECORD

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.