IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
)
JACK J. GRYNBERG and RSM PRODUCTION )
CORPORATION (5299 DTC Boulevard, Suite 500, )
Greenwood Village, Colorado), )
)
                      Plaintiffs, )      JURY DEMANDED
)
  -and- )
)      NO. 1:07-cv-01490 (JR)
ÉLIE DOTÉ, FRANÇOIS BOZIZÉ YANGOUVONDA, )
SYLVAIN N'DOUTINGAI, EMMANUEL TOUABOY, )
EARL CHERRY, and JOHN DOES 1-10, )
)
                      Defendants. )
)
)
)
)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## AMENDED COMPLAINT

The Plaintiffs, Jack J. Grynberg and RSM Production Corporation, a Texas corporation, collectively referred to herein as "RSM," through their undersigned counsel and for their Complaint against Defendants, respectfully allege as follows:

### PARTIES

1.      Plaintiff Jack J. Grynberg is president and CEO of RSM.  At all times material

to this Complaint, Grynberg is the President and CEO of RSM, and acted within the scope of his executive authority. Grynberg is a citizen of the United States and of the State of Colorado. He is a graduate and a trustee emeritus of the Colorado School of Mines. Grynberg has been actively involved in oil and natural gas research, exploration, development and production for more than fifty (50) years and is responsible for numerous oil and natural gas field discoveries and extensions in the United States and overseas. He is a Registered Professional Engineer in good standing in the States of Colorado, South Dakota, Oklahoma and Texas, is a member of many professional and trade associations, author of numerous publications and holder of a U.S. patent. He was appointed by President Ford and reappointed by President Carter to the Committee on Nuclear and Alternate Energy of the National Academy of Sciences. He was appointed by President Clinton to participate in the presidential mission to Russia in March 1994 headed by the late Secretary of Commerce Ron Brown representing the United States oil and gas industry. He has been a speaker at the 5th, 6th and 7th United Nations sponsored conference on African Oil, Gas and Finance, where he represented the United States at the 7th conference.

2. RSM is a Texas corporation that maintains its principal place of business in Arapahoe County, State of Colorado. RSM is an independent, innovative international oil and natural gas exploration, development and production company.

3. Defendant Françoise Bozizé Yangouvonda ("Bozizé"), served as a military advisor to Central African Republic ("CAR") President Ange-Félix Patassé ("Patassé") until March 2003. At that time, Defendant Bozize became President of CAR following a military coup. Defendant Bozize is located at the Ministry, Bangui, CAR.

4. Defendant Élie Doté ("Doté"; "Prime Minister") is the current Prime Minister of the Central African Republic and a Canadian citizen. Defendant Doté is located at the Ministry, Bangui, CAR.

5. Defendant Sylvain N'Doutingai ("N'Doutingai"; "Minister") is the current Minister of Mines and Energy, and recently appointed Minister of Finance. Defendant N'Doutingai is located at the Ministry, Bangui, CAR.

6. Defendant Emmanuel Touaboy is CAR's Ambassador to the United States. He is located at the Embassy for the Central African Republic, 1618 22nd Street, NW, Washington DC 20008.

7. Defendant Earl Cherry is a United States citizen, and upon information and belief a citizen of Louisiana. Cherry is the owner of Cherry Air Aviation Service, 8228 Highway 71 South, Lecompte, Louisiana 71346-4704.

## JURISDICTION

8. This Court has appropriate jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00 and the action is brought by citizens of this country against the Defendants listed, both jointly and severally. In addition, jurisdiction over all Defendants other than Earl Cherry is predicated on the Foreign Sovereign Immunities Act.

9. Venue is appropriate pursuant to 28 U.S.C. 1391(f). Venue is appropriate in the alternative pursuant to 28 U.S.C. 1391(d).

10. At all times material hereto, actions taking place outside the United States were directed at domiciliaries of the United States, causing a "direct effect" in the United States, as

explained more fully below.

## FACTUAL ALLEGATIONS

11. Over the years, RSM and RSM's President and CEO, Jack J. Grynberg have had extensive experience and business dealings in the African continent, including CAR, Cameroon, Senegal, Mauritania and Mozambique.

12. Throughout the 1980s-90s, RSM, and Grynberg personally, spent considerable time, resources and professional effort searching for oil and natural gas potential throughout Central and West Africa, in the present concession area located in the northern sector of CAR, adjacent to the producing oil fields in southern Chad now connected to the Atlantic coast of Cameroon through a 1,066-kilometer pipeline, partially financed by the World Bank.

13. RSM, and Grynberg personally, also expended time, resources and professional effort in meeting with CAR Government officials.

14. In December 1999 the then-Minister of Energy, Mines and Hydraulics, Andre Letou (now deceased), traveled to Denver, Colorado to meet with RSM's representative, and Grynberg personally, to discuss the feasibility of a concession agreement. Minister Letou's travel expenses were shared by the U.S. State Department and RSM.

15. During the December 1999 meeting, Minister Letou stated the Treasury was empty; that CAR wished to bring private developers into the country to invest in its abundant natural resources; and that this would improve its present dire economic condition. The landlocked former French colony of CAR is one of the most impoverished nations in the world. Minister Letou stressed the urgency of his country's economic condition, and the importance of proceeding with all due haste in developing its natural resources.

16. On December 17, 1999, RSM obtained Minister Letou's promise and approval of an exclusive concession for the exploration, development, exploitation and production of oil and natural gas in an area comprising a total of 14,500,000 acres in the north of CAR bordering Chad.

17. On that date, the CAR Government had been elected in UN-supervised elections. The President was Ange-Félix Patassé, a democratically elected head of state.

18. In approving the RSM concession on December 17, 1999, Minister Letou's self-expressed intent was to privatize the energy sector and rapidly increase his country's liquidity, with the distribution of concessions, which are subject to royalties and taxes, rather than production sharing agreements, which require large expenditures of public monies from the Treasury.

19. The exclusive concession agreement RSM negotiated with Minister Letou was ratified by Decree by the President and Council of Ministers on November 24, 2000.

20. RSM proceeded with all due haste by negotiating with Exxon, Conoco and Encana to obtain valuable seismic, well testing, and well log information for areas in and around the concession area. RSM took the following steps, among others.

21. RSM traded with Conoco to obtain its seismic data in northern CAR in return for RSM's seismic data in certain Caribbean areas including St. Lucia, St. Vincent in the Grenadines, Martinique and Guadeloupe.

22. RSM traded with Exxon to obtain seismic data in northern CAR in return for RSM's seismic data certain Caribbean areas including St. Lucia, St. Vincent in the Grenadines, Martinique and Guadeloupe, plus $10,000.00 for copying costs.

23. RSM also traded with Exxon for well log data Exxon had drilled in northern CAR in 1984, as well as all well logs and well completion data.

24. RSM traded with Encana 400 kilometers of seismics in directly adjacent Chad wells, plus on oil discovery well logs drill in Southern Chad adjacent to RSM's concession included in the test data.

25. As of 2002, RSM was able to obtain a total of 3,600 kilometers of seismic data from Conoco and Exxon, which, combined with Encana's 400 kilometers, amounted to 4,000 kilometers. This data required extensive reprocessing of aging, highly water damaged magnetic tapes. Restoration and reprocessing costs alone were in excess of $700,000.00, notwithstanding the value of seismic data taken from the Caribbean in these transactions. By today's standard of $5,500.00 per kilometer, present value of these seismic data is $22 million. An additional 2,700 kilometers (nearest to the Chad side where the pipeline to the Atlantic Ocean is located) must be shot before further drilling. United Reef, Ltd. maintains an option to finance 50% of this cost based on RSM's contributions of its 4,000 kilometers of seismic data.

26. The value brought to CAR by RSM's post-2000 efforts to secure seismic data and financing is enormous. It is an economic opportunity that is being forfeited by the actions of individuals both inside and outside the CAR Government as described below.

27. Commencing in May 2001, CAR had begun its descent into civil war. It soon became impossible for foreigners to enter any areas outside the capital city of Bangui, including the northern sector in which the subject 55,000 square kilometer concession is located.

28. Article 4 of the Concession Agreement required seismic work to commence in

2003. Potential contractors, such as CGG (France) and Western Geophysical (USA), declined to allow their employees to enter CAR citing their concerns for personal safety. Indeed, shortly after the issuance of the concession, the Patassé government informed RSM it must deny access to the Concession area until the civil unrest ended.

29. President Patassé was overthrown by a coup, on March 15, 2003, led by now-President, General Françoise Bozizé. The coup happened while Patassé was out of the country. General Bozizé was Patassé's most trusted military advisor.

30. On April 22, 2003, one month after the coup, RSM gave notice to the new Government of Bozizé that it was invoking Article 28 of the Concession Agreement, initiating force majeure.  The fighting and atrocities in the northern sector had become vastly worse; following the coup, paramilitary forces loyal to Patassé were retreating to the northern sector. The banditry and brigandage in this section was on the upswing due to unpaid mercenary forces, formerly employed by Bozizé in the coup d'etat, remaining in the area rather than returning to their neighboring countries. The force majeure was ratified by the newly installed Minister of Energy, Mines and Hydraulics, Commander Sylvain N'Doutingai, the President's nephew, on November 12, 2003.

31. National elections were held on March 2005. Patassé was enjoined by an indigenous court from appearing in that election. Patassé was accused by coup leaders (the ruling party) of having stolen 70 Billion Central African francs (XAF), approximately $129.5 million, from the CAR treasury. Patassé has strenuously denied this and no judgments or convictions to date have been issued. Bozizé was thus officially elected President.

32. Throughout this period, and pursuant to Art. 29 of the Concession Agreement,

RSM had initiated numerous face-to-face meetings and communications between representatives of RSM and the CAR Government, in order to create a new workscope and resume operations.

33. During the week of February 22, 2004, RSM's representative, Michael D. Coulter, met in Bangui with Minister N'Doutingai, and senior officials of the Ministry, including the Ministry's legal advisor, at N'Doutingai's request.

34. During the week of April 29, 2004, at the Seventh UN Oil, Gas and Finance Conference, in Marrakesh, Morocco, RSM's President and CEO, Jack J. Grynberg, met with various representatives of the Ministry.

35. During the week of October 24, 2004, RSM representative Michael D. Coulter again met in Bangui with senior Ministry officials, including the Ministry's legal advisor, to follow up on meetings and submissions made earlier in the year.

36. By letter dated December 7, 2004, President and CEO Jack J. Grynberg addressed concerns as to the lack of progress on the settlement of force majeure issues to President Bozizé.

37. Despite these attempts to resolve delays arising from the force majeure, no resolutions were offered or accepted by the Government. Minister N'Doutingai, on information and belief, was, in fact, simultaneously approaching potential bidders under the mistaken belief (and yet with the apparent approval of the President) that the Concession Agreement would simply be voidable as a result of the force majeure and the passage of five (5) years as of November 2005.

38. On information and belief, in January 2005, N'Doutingai invited Fu

Changsheng, Deputy Manager for Africa, China National Petroleum Corporation ("CNPC"), to Bangui, and offered to "sell" CNPC an exclusive concession (and proprietary data belonging to RSM) in the same area held exclusively by RSM, without first informing RSM.

39. In August 2005, *African Energy Intelligence* reported that N'Doutingai hired a South African broker in the attempt to sell off the RSM concession.

40. Following the election, the Bozizé Government refused to return telephone calls or correspondence initiated by RSM regarding the concession agreement.

41. On July 1, 2005, Mr. James Panos, Chargé d'Affaires of the U.S. Embassy in CAR, hand-delivered to the Minister, on RSM's behalf, a letter dated June 21, 2005 and a comprehensive Summary Report and Proposed Annual Work Program ("Summary Report") in French dated May 2005, summarizing issues which had not been resolved by meetings held February, April and October 2004, or subsequent correspondence. This hand-delivered letter requested that the Minister advise RSM as soon as possible of a date to meet with him and other Government officials in CAR. The purpose was to return to operations as soon as possible, consistent with the goals of the Concession Agreement. This Summary Report had been prepared at the specific request of the Ministry.

42. On June 23, 2005, Mr. Panos hand-delivered a copy of the Summary Report to Prime Minister Elie Doté.

43. The CAR Government failed to reply in any way.

44. RSM once again sent representatives to Bangui to meet with the Minister, the Prime Minister Elie Doté and President Françoise Bozizé, the week of August 14-21, 2005.

45. Following meetings between RSM representatives and the Prime Minister and

the Minister on August 16, and RSM and the Prime Minister on August 19 and 20, 2005, it became obvious that neither the Ministry nor the Government would honor its obligations pursuant to the Concession Agreement, owing to the newly stated belief that the Concession Agreement would expire on November 24, 2005.

46.     RSM's representatives, including RSM's Vice President and General Counsel, Samuel Yahn, Esq., were accompanied by a seven-member crew of geophysical scientists and engineers simultaneously flown in from Ukraine.

47.     On August 20, RSM's representatives formally represented to the Prime Minister that the crew was ready and able to travel to the concession area to fly in the necessary geophysical equipment and to commence the seismic survey work and that RSM would cover the costs of armed combat troops furnished by the Army to accompany and protect the seismologists and their equipment. That offer was rejected out of hand by the Prime Minister. The Prime Minister specifically forbade any entry into the concession area by RSM's seismologists, thus putting an end to all discussions of the Summary Report and proposed Work Program as of August 20, 2005.

48.      In rejecting the request to gain access to the concession area the Prime Minister informed RSM's representatives, with U.S. Chargé d'Affaires James Panos present, that the Government intended to take up the question as to whether the Concession Agreement was even "legal." Questions as to the legality of the Concession Agreement had never been raised throughout numerous meetings and communiqués. The prior President and Council of Ministers had approved of the Concession Agreement on November 24, 2000. It was therefore on August 20, 2005 that it became clear that the excessive delays under the present

Government were due not to unresolved issues as to force majeure but to conscious and deliberate efforts by the Bozizé Government to block, obstruct or otherwise interfere with the valid exclusive Concession Agreement simply because it had been issued by the previous Government.

49.  A further explanation, ending any hope of resolving purely force majeure matters, was offered by the Prime Minister at the August 20 meeting. The Prime Minister alleged the International Monetary Fund (IMF) was demanding all public contracts meet new standards of "transparency"; due to this requirement, RSM's 1999 Concession Agreement, according to the Prime Minister, would be reevaluated by the Government for lack of transparency, but only following the so-called "termination" of the Concession on November 24, 2005, owing to the fictitious and non-existent five (5) year expiration clause allegedly discovered in the Agreement.

50.  In the period since these declarations of avoidance by the Prime Minister, on information and belief, no "transparency" review by the Government has ever taken place; nor were the Prime Minister's claims, of either a five (5) year expiration or IMF "transparency" review, to be supported by any documentation, law, resolution or court decision. RSM's representatives learned of the professed November 24 "termination" for the first time at the very conclusion of the August 20 meeting, one day prior to their departure from the country.

51.  By letter dated September 6, 2005, RSM requested that the Minister confirm the validity of RSM's Concession Agreement as extended for the duration of the force majeure event within seven (7) days of the receipt of the letter. RSM received no response.

52.  On September 14, 2005, Jack J. Grynberg, President and CEO of RSM, met

with President Françoise Bozizé and Jean-Paul N'Goupandé, Minister of Foreign Affairs of CAR, in the presence of Ambassador Touaboy, in New York, for one hour and forty-five minutes to directly advise the President of the lack of progress on the Concession Agreement and to answer questions regarding RSM posed by the President.

53.     On September 26, 2005, Mr. Michael D. Coulter, President, CEO and Director of United Reef, Ltd., RSM's partner in CAR, met with Prime Minister Doté, then-Minister of Finance and Budget Théodore Dabanga, in the presence of Ambassador Touaboy, at the Hamilton Crowne Plaza Hotel in Washington, D.C., 14th and K Streets, to discuss the RSM project and lack of communication by CAR.

54.     RSM's French legal counsel, Mr. Philippe Auzas, Grand, Auzas & Associes, 6, Rue Paul Valery, 75116 Paris, France, met with Prime Minister Doté in Paris, France at the Hotel Meridien, Montparnasse at 12:00 noon on September 30, 2005. This meeting was arranged by the Director of Protocol for the Prime Minister, who also attended. At this meeting, Mr. Auzas again requested permission to allow a seismic crew into the country.

55.     Despite all these attempts to resolve force majeure issues amicably and at no cost to the Government or the People of CAR, no reply was ever given by the CAR Government on the force majeure issue other than that the Concession Agreement would be terminated on November 24, 2005.

56.     RSM requested that an expertise procedure be instituted pursuant to the Concession Agreement, given an unresolved matter material to operation of the Concession Agreement. The CAR Government again refused to reply, or cooperate.

57.     In late September 2005 Ambassador Touaboy, claiming to be acting on behalf

of Minister N'Doutingai, demanded RSM's extremely valuable, proprietary 4,000 kilometer (geophysical) survey information, together with magnetic tapes of seismic processing, showing where oil and/or natural gas is to be found in the north of CAR, from Mr. Grynberg. These "trade secrets" were valued in excess of $22 million.

58.     Ambassador Touaboy also demanded from Mr. Grynberg a substantial monetary payment before President Bozizé or Minister N'Doutingai would resolve the "issue" with RSM. Grynberg categorically refused both requests.

59.     On information and belief, in late 2005 Minister N'Doutingai hired a South African broker in an effort to get investors to take over the RSM Exclusive Exploration/Production Concession Contract.

60.     In early 2006 RSM brought the matter before the International Chamber of Commerce (ICC) pursuant to the Concession Agreement. The ICC appointed a competent arbitrator.

61.     CAR, acting in bad faith, refused to pay the required €13000 fee and furnished a letter to ICC stating they did not recognize ICC.  The ICC thereupon issued default judgment for RSM.

62.     On May 8, 2006, RSM sent a letter to President Bozizé, in a further attempt to resolve the situation.  A meeting was then organized by U.S. Charge d' Affaires James Panos in New York on June 2, 2006, between President Bozizé, Ambassador Touaboy, Jack J. Grynberg, and Philippe Auzas, who was flown in from Paris specifically for this meeting. During the meeting assurances were given by President Bozizé that the matter should soon be resolved by President Bozizé personally in RSM's favor.

63.     President Bozizé asked RSM's representatives to refrain from taking CAR and its government officials to court. He described any litigation as being undesirable for CAR. In return President Bozizé promised he personally will resolve all force majeure issues, acknowledging that it was RSM's right to continue the exploration, development and production in northern CAR.

64.     On July 12, 2006, Mr. Auzas received a fax from the Minister appointing Mr. Emile Bizon, a CAR attorney, and Mr. Ken Mildwaters, and English attorney, as representatives of the CAR Government in all future matters.  Both Mr. Mildwaters and Mr. Bizon met with Mr. Auzas in Paris on July 26, 2006, presenting RSM with a "standstill agreement" as a condition precedent to for the negotiation of the matter.  That proposed agreement was rejected by RSM as both infringing upon and rescinding RSM's rights under the Concession Agreement.

65.     RSM asked CAR to withdraw Mr. Mildwaters as its attorney, as he was simultaneously representing a British oil company with whom RSM was negotiating a partial farm in to the CAR concession.  CAR refused to withdraw Mr. Mildwater.

66.     On October 25, 2006, Mr. Grynberg received a telephone call from Earl Cherry, owner of Cherry Air Aviation Service, 8228 Highway 71 South, Lecompte, Louisiana 71346-4704.  Mr Cherry informed Mr. Grynberg that he has been doing business with CAR.  Mr. Cherry stated that he had helped CAR buy a used C130 plane and his pilots and mechanics were operating it on behalf of CAR.  The plane was sitting idle on the tarmac in Bangui and he was looking for business.  Mr. Cherry stated that he was dealing directly with President Bozizé and Ambassador Touaboy. When Mr. Grynberg averred that he was having problems with the

CAR Government, Mr. Cherry offered to facilitate the payment of a personal bribe to President Bozizé.  Mr. Grynberg refused the offer.

**FIRST CAUSE OF ACTION - TORTIOUS INTERFERENCE WITH CONTRACT**

67.      Plaintiffs fully incorporate by reference those allegations contained in paragraphs 1-66 above, as though fully set forth herein.

68.      Defendants have intentionally and improperly interfered with Plaintiff's exclusive concession agreement with the CAR, and Plaintiff's prospective business advantages arising out of the issuance of access to an oil and natural gas exploration, development and production exclusive concession agreement with RSM in the CAR.

69.      RSM complied fully with its obligations pursuant to the exclusive concession agreement.

70.      Defendants' actions have prevented Plaintiffs from developing substantial oil reserves in the CAR.

71.      Plaintiffs invested over $20,000,000.00 to date.  Plaintiffs have 4,000 kilometers of newly reprocessed 2-D seismic comprising over 60 drillable prospects for oil.

72.      RSM wishes to conduct an additional 2,700 kilometers of seismic over the area closest to the existing Southern Chad pipeline to Kribi, Cameroon on the Atlantic coast, an available international market.

73.      Defendants have acted unconscionably and in bad faith by delay, interference, obstruction, false assertions of "color of law" concerning the legality and transparency of the concession agreement, and by refusing to honor dispute settlement procedures found therein.

74.      Plaintiffs have obtained a default judgment in the prescribed dispute settlement

arena yet Defendants continue to interfere with and obstruct operations.

75. The Defendants consented to the force majeure in bad faith, with the intention of employing it as a device to void the concession.

76. Defendants are making it impossible for Plaintiffs to operate in the concession area.

77. Plaintiffs have been approached by Defendants improperly seeking bribes.

78. But for the improper interference, CAR would be honoring the concession agreement, and RSM would be able to explore and develop the region and through its efforts reap a very substantial profit.

## SECOND CAUSE OF ACTION - TORTIOUS INTERFERENCE ECONOMIC RELATIONS

79. Plaintiffs fully incorporate by reference those allegations contained in paragraphs 1-78 above, as though fully set forth herein.

80. Defendants have intentionally and improperly interfered with RSM's exclusive concession agreement with the CAR, and Plaintiffs' prospective business advantages arising out of the issuance of access to an oil and natural gas exploration, development and production exclusive concession agreement by RSM in the CAR. Plaintiffs had a reasonable expectation that this relationship would continue absent the improper interference.

81. But for the improper interference, CAR would be honoring the concession agreement, and RSM would be able to explore, develop and produce oil in the region and through its efforts reap a profit in an amount to be determined at trial.

82. Wrongful means include seeking improper bribe payments.

## **THIRD CAUSE OF ACTION – CIVIL CONSPIRACY**

83.     Plaintiff fully incorporates by reference those allegations contained in paragraphs 1-82 above, as though fully set forth herein.

84.     Upon information and belief, each of the defendants herein were participants with each other in an illegal, criminal conspiracy.  The common purpose of this conspiracy was to divert extremely valuable American petroleum rights that rightfully belong to RSM, a Texas Corporation, to another group of individuals or companies.

85.     Each defendant understood this common purpose.

86.     Unlawful overt acts included solicitations of bribes in violation of the Foreign Corrupt Practices Act.

87.     As a proximate result of the civil conspiracy alleged herein, RSM has been damaged in an amount to be determined at trial.  Each defendant herein is jointly and severally liable for all damages.

WHEREFORE, plaintiffs claim for judgment against Defendants, jointly and severally such that each is potentially liable to plaintiffs for the entire damage award for the first three causes of action, in an amount to be determined at trial but exceeding $75,000, for costs and expenses, attorney fees, punitive damages, interest, and for such further and other relief as may be ordered by this Court.

Dated: August 27, 2007.

Respectfully submitted,

\_\_\_\_/s/_____
William T. O'Neil (D.C. Bar #426107)
Burke O'Neil LLC
1718 20th Street
Washington, D.C. 20009
Telephone: (202) 232-5504
Facsimile: (202) 232-5513

Daniel L. Abrams
2 Penn Plaza, Suite 1910
New York, New York 10121
Telephone: (212) 292-5663
Facsimile: (646) 536-8905

Samuel Z. Yahn
5299 DTC Boulevard, Suite 500
Greenwood Village, CO 80111
Telephone: (303) 850-7490
Facsimile: (303) 850-7498