IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JACK J. GRYNBERG, *ET AL.*,                    *            CIVIL DOCKET NO.: 07-1490

    *Plaintiffs*                                      *

                                                      JUDGE JAMES ROBERTSON

v.                                                            *

ELIE DOTE, *ET AL.*,                           *

    *Defendants*                                    *

    *    *    *    *    *    *    *    *    *    *    *    *

## REPLY MEMORANDUM SUPPORTING DEFENDANT EARL CHERRY'S MOTION TO DISMISS

    Earl Cherry ("Cherry") files this Reply Memorandum along with the attached Supplemental Declaration to dispute the facts and legal conclusions made by the Plaintiffs in their response to Cherry's Motion to Dismiss. Cherry would suggest to the Court that his Motion to Dismiss should be granted on venue grounds or, in the alternative, his Motion to Dismiss should be granted on jurisdictional grounds or jurisdictional discovery should be allowed to the Plaintiff.

## I.  STATEMENT OF FACTS

    Rather than recapitulate the facts set forth in Cherry's original memorandum, certain factual allegations made by the Plaintiffs in their response to the Motion to Dismiss bear review. While it is correct that Ambassador Touaboy conducts diplomatic business for the Central African Republic ("CAR") at an office in the District of Columbia, his residence, which is part of the CAR's diplomatic mission to the United States, is in Maryland. Mr. Cherry's supplemental declaration states that he never met with Touaboy at the embassy offices in Washington, D.C. Cherry's other contacts with the ambassador were to Ambassador Touaboy's cell phone and a lunch at the

Ambassador's residence in Maryland. Cherry recalls speaking with the ambassador while the ambassador was in the Central African Republic, in Paris, at the United Nations in New York and otherwise while the ambassador was traveling. The only direct contact Mr. Cherry had with the embassy in Washington, D.C. was a fax he sent to the embassy relative to the purchase of the C-130. This fax occurred before Mr. Cherry had gone to Africa and before he had even heard of Jack Grynberg or the oil concession.

The Plaintiff's complaint and response memorandum make unsupported allegations of contacts by Ambassador Touaboy to Mr. Cherry and the other alleged co-conspirators from the District of Columbia. However, the Plaintiffs can supply no dates and times of such contacts or identify with specificity any such contacts by their substance.

The only substantive allegations made by the Plaintiffs that creates any connection with the District of Columbia is that of one single meeting at a hotel within the District. In paragraph 53 of the amended complaint, Plaintiffs allege that a meeting between Plaintiff's partner, Mr. Colter, and certain CAR officials took place in the Hamilton Crowne Plaza Hotel to discuss the RSM project and the lack of communication by the CAR. The Plaintiffs were not in attendance at this meeting. However, the complaint is completely void of any factual assertion as to how this meeting somehow advanced the objectives of the alleged conspiracy by the defendants to interfere with Plaintiff's alleged rights to an oil concession in the CAR. Moreover, no allegation is made as to how Mr. Cherry was even remotely connected to this meeting, much less had an awareness of it or authorized it as a co-conspirator. This meeting took place on September 26, 2005. Mr. Cherry's first contact with the CAR was on August 25, 2006. Clearly, this meeting provides no link between Cherry and the District of Columbia.

As stated in the memorandum attached to Cherry's Motion to Dismiss, Cherry specifically denies soliciting a bribe from the Plaintiffs on behalf of the CAR. The conversation between Cherry and Grynberg is misconstrued in the pleadings. Mr. Cherry told Mr. Grynberg that Grynberg's communication difficulties with the CAR could be resolved by the retention of a local contact in the CAR. The local contact would have to be paid. Mr. Cherry related that he had added the cost of Cherry's local contact to Cherry's bill to the CAR regarding the testing and delivery of the C-130 to the CAR. The necessity of the local contact is due to the paucity of communications available to the CAR, due to extremely limited phone service that is only on for a few hours a day, the lack of internet service and the slowness of mail to that part of Africa.

As will be discussed below, the allegations made by the Plaintiffs are insufficient to create minimum contacts between Cherry and the District of Columbia. The fact of applying for a visa from the CAR through its embassy is inadmissable for jurisdictional purposes under the "government contacts" exception in the applicable jurisprudence. However, Mr. Cherry did not apply for a visa at the Central African Republic embassy. As his supplemental declaration states, when he arrived in the CAR his visa was already ready for him and presented to him in the CAR. Plaintiff's allegations that Cherry "must have" made contact with Ambassador Touaboy in the District of Columbia are wholly unsupported. As to Mr. Cherry's actual contacts with the District of Columbia, Mr. Cherry's declaration states that he is only been physically present in the District of Columbia three times over the last twenty years, with these visits being made to the District as a tourist only and not for purposes of business.

## II. LAW AND ARGUMENT

### A. Venue is Improper as to Cherry

Cherry would reiterate his arguments in his original memorandum that have been largely unaddressed in the Plaintiff's Opposition To The Motion to Dismiss. The Plaintiffs hang their hat on the argument that a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the District of Columbia under 28 U.S.C. § 1391(a)(2). At this juncture, it is important to note that the Plaintiffs bear the burden of proving proper venue. *See Abramoff v. Shake Consulting Co., LLC,* 288 F.Supp 2d 1, 3 (D.C. Cir. 2003).

The cases Plaintiffs cite in their memorandum as supportive of their position that a substantial part of the events or admissions giving rise to their claims occurred in the District of Columbia are simply inapplicable to the facts of this case. In each case cited on page 9 of Grynberg's memorandum, the plaintiff was a resident of the forum state at issue, communications were directed by the defendants to the plaintiff in the forum state, and some injury was realized by the plaintiff in the forum state. In the case at bar, the Plaintiffs reside in Colorado and Texas, the injuries were realized in Colorado, Texas, or the CAR, and no communications are alleged to have been directed to the Plaintiffs while in the District of Columbia. These cases have few facts in common with the case at bar are, therefore, not pertinent.

The Plaintiffs' complaint sounds in tortious interference with contract and socioeconomic relations, or a conspiracy to commit either of these acts. In tort cases, venue is proper when the tortious act occurred under the "substantial part of the events or omissions test" of 28 U.S.C. § 1391(a)(2). *See Hoffman v. Fairfax County Redevelopment and Housing Authority,* 276 F.Supp.2d 14 (D.D.C. 2003) and *Smith v. Fortenberry,* 903 F. Supp. 1018 (E.D. La. 1995). The contractual and

economic relations which the Plaintiffs allege were damaged are with the CAR, and the Plaintiffs are domiciled and therefore receive their injuries in either Texas, Colorado or the CAR. The District of Columbia is clearly not a proper venue from a tort standpoint.

As to contractual cases, venue can be more of a complex issue due to differing locations of communication regarding, execution of, and performance under contracts. In the case of *Abramoff v. Consulting Co., LLC, supra*, the plaintiff sued the defendants for breach of contract and breach of the duty of good faith and fair dealing. The substance of the contract was an agreement by the defendants to propose a plan of reorganization in a chapter 11 case in Florida. The plaintiff resided outside of the District of Columbia in Maryland. The connection of the agreement and the plaintiff's claims to the District of Columbia were follows:

(1)     The plaintiff and the defendants met in the District of Columbia and confected the terms of the agreement;

(2)     The plaintiff's attorney conducted negotiations by telephone, email, and fax with the defendant's attorneys in South Florida from an office in the District of Columbia; and

(3)     The plaintiff claimed a principal place of business in the District of Columbia, and signed the agreement on his behalf inside the District of Columbia.

*Id at pp. 3,4*.

Despite these contacts, the court determined that venue was not proper in the District of Columbia, "because a substantial part of the events or omissions giving rise to the Plaintiff's claims did not occur in the District of Columbia." *Id at p. 5*. The court noted that "entry into an agreement does not automatically qualify as a substantial part of the events or omissions giving rise to a breach of contract claim." *Id. (Citations omitted)*. And the court also stated, "the fact that the Plaintiff may feel damages in the District of Columbia does not create venue under § 1391(a)(2)."

*Id. (Citations omitted).*  The court noted, first and foremost, that performance of the contract was not to take place in the District of Columbia.  *Id.*  Based on these factors, the court determined that venue was not proper in the District of Columbia.  *Id.*

The connections between the claims in the instant law suit and the District of Columbia are far more tenuous than those in *Abramoff*.  As to the contract between the Plaintiffs and CAR, one meeting at which the Plaintiffs were not in attendance regarding the contract in the District of Columbia is clearly less substantial than the extensive negotiation and execution of a contract inside the District of Columbia in *Abramoff*.  Moreover, Mr. Abramoff claimed that he had a principal place of business in the District of Columbia, a contention Mr. Grynberg and RSM Production cannot make.  Clearly, venue does not lie in the District of Columbia for this action, since venue did not lie in *Abramoff* under far stronger facts connecting that suit to the District of Columbia.

B.    **Mr. Cherry's Business Transacted With the CAR Embassy Falls Within the "Government Contacts" Rule.**

As noted earlier in the memorandum, Plaintiffs' allegations that Mr. Cherry was in contact with Ambassador Touaboy in Washington, D.C. are disputed.  Cherry made only one facsimile transmission to the CAR Embassy in Washington, D.C., which was wholly unrelated to Plaintiffs' allegations.  Any contacts Cherry had with the Embassy cannot be used to establish minimum contacts with the District of Columbia for purposes of personal jurisdiction.

Applicable case law holds that contacts with the District of Columbia by virtue of the unique presence of the federal government in the District are insufficient to establish minimum contacts for purposes of personal jurisdiction.  Known as the "government contacts" exception, this principle applies when an assertion of jurisdiction is made over a non-resident whose only contact with the

District of Columbia is with Congress or a federal agency. See *AGS International Services, S.A. vs. Newmont USA, Limited*, 364 F. Supp. 2d 64, 79 (D.D.C. 2004). As another Court stated, ". . . a defendant's relationship with federal agencies do not enter into the calculus of minimum contacts with the District of Columbia for jurisdictional purposes." *Chrysler Corp vs. General Motors Corp.*, 589 F. Supp. 1182, 1196 (D.D.C. 1984), citing *Mueller Brass Company vs. Alexander Milburn Co.*, 152 F. 2d 142 (D.C. cir. 1945). Additionally, contacts with diplomatic missions accredited to the federal government fall within the government contacts exception. See *AGS International,* supra, at p. 80 citing *Fandel vs. Arabian Oil Company*, 345 F. 2d 87, 89 (D.C. cir. 1965).

In this case, the allegations of mere "contact" with the Ambassador for the CAR clearly fall within the government contacts exception. Without more, Plaintiffs' attempted assertion of jurisdiction over Cherry in the District of Columbia must fail.

**C.    Plaintiff's Allegations are Insufficient to Support Conspiracy Jurisdiction.**

Inasmuch as the Plaintiffs do not have evidence of minimum contacts between Cherry and the District of Columbia, the Plaintiffs in the alternative plead conspiracy as a basis for personal jurisdiction. The premise behind conspiracy jurisdiction is that, in a conspiracy, each party makes the other parties to the conspiracy his agent for purposes of transacting business. The Plaintiffs bear the burden of showing a *prima facie* case of pertinent jurisdictional facts to make a case for conspiracy jurisdiction. *Second Amendment Foundation vs. United States Conference of Mayors,* 274 F. 3d 521, 524 (D.C. cir. 2001). Moreover, "[p]ersonal jurisdiction, even if based on conspiracy, requires 'purposeful availment' of the forum jurisdiction at issue." *Youming Gin vs. Ministry of State Security,* 335 F. Supp 2d 72, 80 (D.D.C. 2004).

In the *Youming Gin* case, the Court addressed a suit by the plaintiffs against elements of the

government of the People's Republic of China and certain United States residents for a conspiracy

to intimidate and harm plaintiffs, who were followers of a certain religious practice, Falun Gong, in

order to eradicate the practice which was outlawed in China. In this case, the plaintiffs alleged that

the defendant Alexander Hugh committed certain tortious acts in Chicago in furtherance of this

conspiracy.  The plaintiffs further alleged that other co-conspirators had committed tortious acts in

the District of Columbia.  These facts, plaintiffs asserted, supported conspiracy jurisdiction over

Alexander Hugh.  The Court ruled that the allegations and evidence were insufficient to establish

personal jurisdiction:

> "However, because this Court concludes that the plaintiffs must
> demonstrate purposeful availment, the acts of the alleged co-
> conspirators in this form fall woefully short of satisfying due
> process."  *Id*. at p. 83.

The Court then allowed for jurisdictional discovery for the plaintiffs to discovery facts that would

show purposeful availment of the District of Columbia by Mr. Hugh.

In the case of Earl Cherry, the only "purposeful availment" of the District of Columbia by

Mr. Cherry falls within the government contacts exception, with these facts "not entering the

calculus" personal jurisdiction.  Moreover, Mr. Cherry's three visits to our nation's capital as a

tourist are insufficient to create purposeful availment of the form of District of Columbia.

**D.**    **Even if Minimal Contacts Exists Between Cherry and the District, Due Process Does
Not Count Enance Jurisdiction.**

In response to Cherry's Motion to Dismiss, plaintiffs make vague suppositions that Mr.

Cherry operates "a far flung business empire" in stating that Cherry has no burden to defend this

lawsuit in the District of Columbia.  Mr. Cherry is a pilot and owns a C-130 airplane which is

available for hire.  Mr. Cherry also offers his services as a pilot of C-130 aircraft and is an inspector,

tester and repairer of C130's.  While his business may take him even as far as the Central African Republic, he is reimbursed for his expenses when he travels to different locales and his stays in such places are short lived.  Mr. Cherry maintains an office in Rapides Parish and has a single airplane. A single office and an airplane do not a far flung business empire make.

In the instant lawsuit will have to spend significant personal resources in the form of money and time in defending this lawsuit in the District.  The burdens on Mr. Cherry remain significant despite Plaintiffs' asseverations to the contrary.

The Plaintiffs' unsupported legal supposition that the interest of the District of Columbia in resolving this lawsuit is coterminous with the District's long arm statute must be rejected by this Court.  To rule otherwise would make nugatory the propriety factors outlined in *Burger King Corp vs. Rudzewicz,* 471 US 462, 476-477 (1985), *Wold Wide Volkswagen vs. Woodson,* 440 US 286, 292 (1980), and *Asahi Metal Industries Company vs. Superior Court of California*, 480 US 102, 113-114 (1987).  In each of these cases, the applicable long arm statute was considered separately from the interest of the state in adjudicating the dispute.  Rather, the facts that none of the parties to this lawsuit reside in the District of Columbia and no injuries by the plaintiffs were sustained in the District are dispositive of the issue of the District's interest in resolving this dispute.  In short, the District has no interest.

The Plaintiffs have neither demonstrated nor argued for any particular interest of Plaintiffs, a Colorado citizen and a Texas corporation, for resolving this lawsuit in the District.  Considering that the Western District of Louisiana is geographically closer to both Texas and Colorado than is the District of Columbia and a good venue with jurisdiction as to all defendants in this action, Plaintiffs' choice of venue is this instance would appear to be forum shopping with the intent to pick

-9-

to the most burdensome forum for Mr. Cherry.

As noted in Cherry's original memorandum, the factors enumerated in the case law regarding the proprietary of the exercise of personal jurisdiction over a non-resident defendant on due process grounds clearly militate against this Court's exercise of jurisdiction over Mr. Cherry.  This case should be dismissed without further discovery solely on that basis.

## I.  CONCLUSION

Defendant, Earl Cherry, requests that the Court enter judgment in favor of the defendant and against the plaintiffs, granting the defendants motion to dismiss the plaintiffs claims pursuant to Federal Rule of Civil Procedure 12(B)(2) and 12 (B)(3) and dismissing Earl Cherry from this lawsuit at Plaintiffs' costs.

Dated: February 15, 2008

Respectfully submitted,


*SIMMS SHOWERS LLP*

By: /s/J. Stephen Simms
      J. Stephen Simms
      Suite 702
      20 S. Charles Street
      Baltimore, Maryland 21201
      Office Phone Number: 410-783-5795
      Telecopier: 410-510-1789

**ATTORNEYS FOR DEFENDANT, EARL CHERRY**

OF COUNSEL:

**_GOLD, WEEMS, BRUSER, SUES & RUNDELL_**
Bradley L. Drell (La. Bar Roll #24387)
B. Eric Crooker (La. Bar Roll # 29812)
2001 MacArthur Drive
P.O. Box 6118
Alexandria, LA 71307-6118
Phone: 318-445-6471
Fax: 318-445-6476

**ATTORNEYS FOR DEFENDANT, EARL CHERRY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing Reply Memorandum Supporting

Defendant Earl Cherry's Motion to Dismiss and the Supplemental Declaration of Earl Cherry have

been served on all counsel of record via the Court's CM/ECF system this 15th day of February,

2008.

<u>/s/J. Stephen Simms</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JACK J. GRYNBERG, *ET AL.*, | * | CIVIL DOCKET NO.: 07-1490 |
| *Plaintiffs* | * | |
| | | JUDGE JAMES ROBERTSON |
| v. | * | |
| ELIE DOTE, *ET AL.*, | * | |
| *Defendants* | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### SUPPLEMENTAL DECLARATION OF EARL CHERRY UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. §1764

I, **EARL CHERRY**, under penalty of perjury pursuant to 28 U.S.C. §1764, do declare as follows in connection with the Motion to Dismiss I filed in the above captioned action:

1.

That I am, and have been at all times pertinent to the lawsuit filed against me by Jack J. Grynberg and RSM Production Corporation, a citizen of the United States and a domiciliary of the State of Louisiana, and, more specifically, Rapides Parish.

2.

That I do not and have not ever transacted business, provide services, or own property in the District of Columbia, except otherwise delineated herein in this declaration.

3.

That I have no contacts, ties, or relations to the District of Columbia, other than the above captioned lawsuit except as delineated herein in this declaration; I have visited the District of Columbia on three occasions in the past twenty years; each visit was as a tourist and not for purposes of conducting

any business.

4.

On August 25, 2006, I was retained by the Central African Republic ("CAR") for purposes of acting as a consultant for the CAR in the purchase of a C-130 aircraft which was being financed for the CAR by the World Bank.

5.

I was to test the C-130 to be purchased by the CAR from a third party and perform any repairs needed; I flew the plane from Lake City, Florida to Alexandria, Louisiana, wherein I tested the plane and completed the necessary maintenance.

6.

I was also retained to fly the C-130 to the CAR when the C-130 was ready for delivery; I flew the plane to the CAR and arrived on October 5, 2007, and stayed for approximately one week in the CAR..

7.

My initial contact with agents of the CAR was in Louisiana.

8.

My subsequent telephone contacts with Ambassador Touaboy were by calls to his cellphone; based on my recollection, I spoke to Ambassador Touaboy while in the CAR, in Paris, at the United Nations in New York, or when he was otherwise in transit between destinations; I do not recall speaking with Ambassador Touaboy while he was in the District of Columbia.

9.

I do recall sending one facsimile transmission to the CAR Embassy in Washington, D.C., regarding the purchase of the C-130 aircraft.

10.

I do not maintain an office or any other facility in the CAR, but I am willing to let my services as pilot and my C-130 for the use of clients world-wide.

11.

It was in the context of my business as delineated in paragraph 10 of this Declaration that I contacted Ambassador Touaboy in October of 2006, after my visit to Africa wherein I delivered the CAR's C-130 plane, regarding potential clients having business in the CAR who might have use for my C-130.

12.

Ambassador Touaboy related that Mr. Grynberg had an oil concession in the northeast part of the CAR, which is only efficiently reachable by airplane from the city of Bangui, the capital of the CAR; this is the sole conversation that I had with Ambassador Touaboy or any other CAR official regarding Grynberg or the oil concession in the CAR.

13.

On October 25, 2006, I telephoned Mr. Grynberg using the number given to me by Ambassador Touboy, soliciting business for the use of my C-130 aircraft and my services as pilot.

14.

After Mr. Grynberg related the difficulties he was having in doing business with the CAR government, I related to him the need to have a local paid contact in the CAR in order to do business with the CAR government, as communications are primitive in the CAR, with the telephones only being active a few hours per day, internet service being practically non-existent, and the mails being unreliable.

15.

I related to Mr. Grynberg that I had simply added the cost of my local contact in the CAR to my bill to the CAR for my services regarding the purchase of the C-130 aircraft.

16.

In December of 2006 or January of 2007, I was in Maryland visiting family, and during that time I had lunch one day with Ambassador Touaboy at his residence in Maryland; we did not discuss Grynberg or the oil concession.

17.

I never applied for a Visa for the CAR from the CAR embassy in Washington, D.C.; rather, when I arrived in the CAR with the CAR's C-130 airplane amid much fanfare among government officials who were present when I landed, my Visa was there waiting for me having been prepared by government officials in the CAR.

This 15th day of February, 2008.

_____/s/ Earl Cherry_____
**EARL CHERRY**