UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JACK J. GRYNBERG, ET AL.,          :    Civil Action No. 07-1490
                                   :
            Plaintiffs             :
                                   :
v.                                 :    October 3, 2008
                                   :
                                   :
ELIE DOTE, ET AL.,                 :    11:00 a.m.
                                   :
            Defendants             :
. . . . . . . . . . . . . . . . :  . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiffs:            DANIEL L. ABRAMS, ESQUIRE
                                 LAW OFFICE OF DANIEL L.
                                 ABRAMS PLLC
                                 Two Penn Plaza
                                 Suite 1910
                                 New York, NY 10121
                                 (212) 292-5663

                                 KELLY PRIDE HEBRON, ESQUIRE
                                 PRIDE LAW OFFICE, LLC
                                 1400 Mercantile Lane
                                 Suite 208
                                 Largo, MD 20774
                                 (301) 583-4633

  For the Defendant:            NO APPEARANCE

  Court Reporter:              REBECCA STONESTREET, RPR,CRR
                               Official Court Reporter
                               Room 6511, U.S. Courthouse
                               Washington, D.C. 20001
                               (202) 354-3249

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1                          **P R O C E E D I N G S**

2              COURTROOM DEPUTY:  This is Civil Action 07-1490, Jack

3     Grynberg, et al. versus Elie Dote, et al.  Daniel Abrams and

4     Kelly Hebron for the plaintiffs.

5              MS. HEBRON:  Good morning, Your Honor, Kelly Hebron.

6              MR. ABRAMS:  Good morning, Your Honor.

7              THE COURT:  Good morning.  This matter is before the

8     Court on a motion for a default judgment.  It's an unusual case,

9     to say the least:  Tortious interference with a contract, about

10    an oil and natural gas concession in the Central African

11    Republic.

12              The plaintiffs are Jack Grynberg, who lives in

13    Colorado, and the Texas corporation that he apparently owns or

14    operates called RSM Production.  The defendants are three

15    government officials of the Central African Republic.  There was

16    an American defendant, but he's been dismissed for lack of

17    personal jurisdiction.

18              The plaintiff wants me to enter a default judgment

19    against the Central African Republic defendants, and the reason

20    we're all here is that 28 U.S.C. 1608(e) provides that:  "No

21    judgment by default shall be entered by a Court of the United

22    States or of a state against a foreign state, a political

23    subdivision thereof, or an agency or instrumentality of a

24    foreign state, unless the claimant establishes his claim or

25    right to relief by evidence satisfactory to the Court."

1          Plaintiff has filed a memorandum in anticipation of

2    this hearing, but the memorandum doesn't provide any evidence,

3    just describes the procedural aspects of the case.

4          And so I turn to counsel for the plaintiff and ask what

5    evidence you intend to present this morning that would be

6    satisfactory to the Court and support your claim to a judgment

7    by default.

8          MR. ABRAMS:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10          MR. ABRAMS:  Dan Abrams.  We are here today to present

11    evidence of what happened between Mr. Grynberg on the one hand

12    and Central African Republic on the other.  Mr. Grynberg has

13    almost a half a century of experience in developing oil and gas

14    deals.  He'll talk --

15          THE COURT:  Is he going to testify?

16          MR. ABRAMS:  Yes.

17          THE COURT:  Then you don't need to repeat what he's

18    going to say.

19          MR. ABRAMS:  Fair enough, Your Honor.  We can call him

20    to the stand now.

21          THE COURT:  Let's put him on the stand.

22          MR. ABRAMS:  Okay.  Actually, one thing I would like to

23    ask before we put him on the stand is if we can -- I would like

24    to make an oral motion to have these proceedings under seal.

25    Part of what Mr. Grynberg will speak to today is extremely

1   valuable proprietary seismic information which the Central

2   African Republic and the individual defendants have attempted to

3   obtain from Mr. Grynberg worth literally millions of dollars.

4   And we don't want their nonappearance in this case to be used as

5   a way of getting the information, as opposed to negotiating for

6   it.

7           THE COURT:  Well, look around you in the courtroom.  Is

8   there anybody in this courtroom who are strangers to the case?

9           MR. ABRAMS:  I don't know everybody in the courtroom.

10          THE COURT:  I'm not going to put this matter under

11  seal.  If there's something he doesn't want to talk about on the

12  witness stand, let him not talk about it.

13          MR. ABRAMS:  Very well, Your Honor.

14          Plaintiff calls Jack Grynberg to the stand.

15          THE COURT:  All right.  By coincidence, I just got a

16  questionnaire yesterday from the Federal Judicial Center about

17  cases under seal.  There's a good deal of scrutiny of practices

18  of courts putting cases under seal, and it's not a favored

19  device, really.  This is a public courtroom.

20          Have a seat, Mr. Grynberg, after you're administered

21  the oath.

22          (Oath administered by Courtroom Deputy.)

23          MR. ABRAMS:  Your Honor, may I just have a minute and

24  I'll be right up there?

25          And before we get started, let me just pass these up.

1    These are going to be demonstratives that we will refer to a

2    little bit later.  Just so as to not upset the flow, I'll pass

3    up Your Honor's copy.

4              THE COURT:  Okay.

5              MR. ABRAMS:  Can I also pass one to the witness?

6              THE COURT:  Yes.

7              MR. ABRAMS:  Thank you, Your Honor.

8         **(JACK GRYNBERG, PLAINTIFF witness, having been duly sworn,**

9                      **testified as follows:)**

10                     **DIRECT EXAMINATION**

11   BY MR. ABRAMS:

12   Q.  Can you please state your name for the record?

13   A.  My name is Jack J. Grynberg, spelled G-R-Y-N-B-E-R-G.

14   Q.  And Mr. Grynberg, can you tell the Court what your

15   occupation is?

16   A.  I'm a petroleum engineer as well as a geophysical engineer.

17   Q.  And where do you work?

18   A.  In Denver, Colorado.  That's my main office.  But the work

19   is both domestic and international.

20   Q.  What is your present title?

21   A.  I'm president of various family owned companies.

22   Q.  Would that include RSM Production Corp.?

23   A.  Yes.

24   Q.  Can you briefly describe what it is that you do in your oil

25   exploration activities?

1   A.  Well, starting with my training, I have a professional

2   engineer's degree, now called master of science in engineering,

3   petroleum refining, and chemical engineering.  I have a

4   professional engineer's degree in petroleum production

5   engineering, and I'm all but thesis for a doctorate in

6   geophysical engineering, all from Colorado School of Mines.

7   Q.  What year did you graduate Colorado School of Mines?

8   A.  First degree was in 1952, the second was in 1959.  And I

9   also spent six years on the board of trustees of Colorado School

10  of Mines.

11  Q.  What did you do upon leaving the Colorado School of Mines in

12  1959?

13  A.  Well, actually, it was in 1953 when I left graduate school.

14  I went to work for Continental Oil Company, now called Conoco

15  Phillips, in research and development as a petrophysicist in

16  Ponca City, Oklahoma.

17       I then served in the United States Army research and

18  development command in Edgewood, Maryland, just north of here.

19  My capacity was a scientific spy.  I worked on Soviet

20  radioactive warfare.

21  Q.  And when is it that you sort of went out on your own?

22  A.  I went out on my own in -- well, I went out on my own in

23  1954, except U.S. Army '56 and '57, but I was a consultant until

24  1962.  In 1962 I became what is now known in my industry as an

25  independent oil and gas operator domestically, and subsequently

1    internationally.

2    Q.  And what parts of the world have you been involved in?

3    A.  I have been involved in the North Sea, both on the British

4    side and the Dutch side; I've been involved in the Aegean Sea,

5    offshore Greece; I've been involved in Cyprus; I drilled a well

6    in the Dead Sea, in Israel; I drilled a well offshore Madagascar

7    in the Indian Ocean; I was involved in Papua, New Guinea; I was

8    involved in Central America, in offshore Nicaragua, offshore

9    Panama, offshore Trinidad & Tobago; I am now involved offshore

10   Belize; I've been involved in Ecuador, was nationalized three

11   months ago on a very large tar sand deposit in Ecuador.

12            I've been involved in -- I'm involved in offshore

13   Grenada; offshore St. Vincent and the Grenadines; offshore

14   St. Lucia; offshore Martinique; offshore Guadeloupe and offshore

15   St. Pierre & Michelon in the Atlantic Coast; offshore Caspian

16   Sea, in Kazakhstan and onshore Kazakhstan; onshore Cameroon in

17   West Africa, where I'm still involved and very active; and

18   onshore Central African Republic.  I think that's pretty much...

19            I'm sorry, offshore Ghana.  I drilled three wills

20   offshore Ghana.

21   Q.  Have you received any particular awards in recognition of

22   your contributions to the petroleum industry?

23   A.  I was given the distinguished achievement medal by the

24   Colorado School of Mines; I have a patent, a United States

25   patent, using laser beam in detecting hydrocarbons coming out of

1    a bore hole; I'm a registered professional engineer in the

2    states of Colorado, Oklahoma, Texas, and South Dakota.

3         I was appointed to the committees by several

4    presidents; I was appointed by President Ford to the Committee

5    on Nuclear and Alternative Energy Systems of the National

6    Academy of Sciences, and reappointed by President Carter to the

7    same committee; I was appointed by President Clinton to a

8    special task force to represent the oil and gas industry in

9    negotiating a framework with Russia; I represented the U.S.

10   Department of Energy in conference in Luwanda, Angola, as well

11   as United Nations conference in Yaounde, Cameroon.

12        I was asked to write two bills presently in front of

13   United States Congress; one is HR435, which is now in a

14   committee, to prevent theft from Federal and Native American

15   lands; and another Congressional bill, 6188, that was just

16   introduced to put some teeth in the Foreign Corrupt Practices

17   Act, amend the Foreign Corrupt Practices Act.

18   Q.  Can you describe for the Court any teaching or lecturing you

19   do in your field?

20   A.  I've given lectures.  I've given three series of lectures --

21   or four series of lectures on -- in the Africa Energy Forum, the

22   first one four years ago in Barcelona, Spain; subsequently in

23   Lille, France; a year ago in Hamburg, Germany; and this past

24   July in Nice, France, on various topics.  The last one was

25   biofuels in Africa.

1      I have given from '57 through '62 a series of

2  international courses on petroleum reservoir engineering and

3  economics, as well as on geophysics and petrophysics.

4  Q.  Now, Mr. Grynberg, as you know, we're here -- this case is

5  about a tortious interference with a concession agreement.  Can

6  you describe for the Court briefly some other concession

7  agreements which you've been involved in?

8  A.  I have been involved in concessions in Kazakhstan, in

9  Cyprus, in Madagascar, in Israel, in the Dutch North Sea, in the

10  British North Sea, in Cameroon, in Ghana; in addition, of

11  course, the Central African Republic, all the various other

12  countries I've mentioned such as Ecuador and Belize, Nicaragua,

13  Panama, Grenada, St. Vincent, the Grenadines, St. Lucia,

14  Martinique and Guadeloupe.

15      THE COURT:  Mr. Abrams, I am very much impressed with

16  the background and experience of Mr. Grynberg.  I have to tell

17  you that the recitation of all the places he's been, there's a

18  Johnny Cash song that keeps running through my mind, and I think

19  we ought to get on to --

20      MR. ABRAMS:  The giant what on your mind, Your Honor?

21      THE COURT:  You're from New York.  You probably don't

22  know about Johnny Cash.

23      MR. ABRAMS:  A little before my time, I guess.

24      THE COURT:  Oh, that hurts.

25      MR. ABRAMS:  I've heard of him, I just don't --

1          THE COURT:  He's not before Mr. Grynberg's time.

2     Johnny Cash has a wonderful song that says, "I've been

3     everywhere, man, I've been everywhere," and that keeps running

4     through my head.

5          MR. ABRAMS:  I know the song.

6          THE COURT:  And I know that Mr. Grynberg has been

7     everywhere, but I don't know what a concession is.

8          MR. ABRAMS:  Okay.

9          THE COURT:  Let's get to that.

10         MR. ABRAMS:  That will be my next question.

11         THE COURT:  Good.

12         MR. ABRAMS:  But let me just -- one more thing before

13    we turn off of this.  I would like to move to get Mr. Grynberg's

14    resume' into evidence.

15         THE COURT:  Fine.  I'll receive it.  Hand it to the

16    courtroom deputy.

17         THE WITNESS:  And Your Honor, may I excuse myself for

18    my appearance?  I had recent surgery on a hernia on my stomach.

19         THE COURT:  Mr. Grynberg, between old guys, you look

20    great.

21    BY MR. ABRAMS:

22    Q.  Mr. Grynberg, I'm showing you what has been marked as

23    Plaintiff's Exhibit 1.  Do you recognize that document?

24    A.  Yes.

25    Q.  What is that document?

1    A.  It's a resume' which I prepared.

2    Q.  Is it an accurate reflection of your work experiences?

3    A.  Yes.

4    Q.  Thank you, Mr. Grynberg.  Mr. Grynberg, before I get to

5    that.

6         MR. ABRAMS:  Can we move to get Mr. Grynberg's resume'

7    into evidence?

8         THE COURT:  You just did and I received it.

9         (PLAINTIFF Exhibit Number 1 was moved into evidence.)

10   BY MR. ABRAMS:

11   Q.  Mr. Grynberg, what is a concession?

12   A.  A concession is a right to explore for oil and gas to be

13   recovered over a specific area; subsequently, the right to

14   explore is automatically converted to a right to produce oil and

15   gas subject to the terms of such a concession.  And the terms

16   are a royalty, which is a percentage of the gross given to the

17   government, plus income taxes paid on net revenue.  The

18   royalties from the gross, the income taxes are on the net

19   revenues.  That is the standard forum.

20        There's some new forums that's called production

21   sharing, where in fact in order to prevent double taxation

22   between a country and the United States, the production sharing

23   is a tax paid out of production to a given government, credited

24   against U.S. tax.

25   Q.  And who -- when you sign a concession agreement, who is

1   typically on the other side of the bargaining table?

2   A.   It's usually the prime minister or the president of the

3   country involved, and then subsequently approved by the

4   parliament.

5         MR. ABRAMS:   This is Exhibit 2, the concession

6   agreement.

7   BY MR. ABRAMS:

8   Q.   Mr. Grynberg, I've just handed you what's being marked

9   Plaintiff Exhibit 2.

10  A.   It's the English version of the concession agreement which

11  was executed in French.

12  Q.   Which concession agreement?

13  A.   The concession agreement between the Central African

14  Republic and RSM Production Corporation.   And RSM is a company

15  owned by our three adult children.   It stands for Rachel,

16  Steven, and Miriam.

17  Q.   And what role did you play in the negotiation of the

18  concession agreement?

19  A.   I negotiated a concession agreement with the help of the

20  United States embassy in Bangui, that's the capital of

21  Cameroon, and subsequently ratified by the then-president,

22  Mr. Felix Patasse.

23  Q.   And when was the concession agreement entered into?

24  A.   It was entered into in December '99, and ratified by the

25  president in November of the year 2000 by the then-president.

1  He's no longer president.

2  Q.  Now, can you briefly describe to the Court what has happened

3  in the aftermath of the concession agreement that has led us to

4  where we are today?

5  A.  We have conducted seismic survey operations by acquiring

6  seismic throughout the area - that's the northern part of

7  Central African Republic, an area that covers 14 and a half

8  million acres - as well as seismic across the border in Chad in

9  order to correlate to the existing production in Chad, and

10  determined approximately 60 drillable prospects to the depth of

11  8,000 feet, with two potential producing horizons, the upper and

12  the lower Cretaceous.  And we were prevented from bringing the

13  seismic crew to do additional work, another 2,700 kilometers.

14  We have 4,000 kilometers in order to be closest to the pipeline.

15       The pipeline has been built and in operation

16  approximately two years ago, financed by the World Bank, a

17  pipeline from Southern Chad going into the Atlantic Coast, into

18  Kribi, K-R-I-B-I, in Cameroon, that is operated by Exxon Mobil,

19  financed by the World Bank, about a $1.6 billion pipeline.

20  Because it was financed by the World Bank, it is an open access

21  pipeline.  That means oil from other areas can enter the

22  pipeline and be transported to markets.

23       The pipeline has a potential capacity of

24  850,000 barrels a day.  It is operating now at about 250 to

25  300 thousand barrels a day.

1    Q.   Now, you had mentioned that you were not able to continue

2    with your seismic work?

3    A.   That is correct.

4    Q.   Why have you been unable to continue the seismic work that

5    you started?

6    A.   The new president, who overthrew the previous president - he

7    was the Army chief of staff, and the coup d'etat was in March of

8    2003 - through his ambassador, Emmanuel Touaboy, demanded a

9    $2 million bribe to be paid in Switzerland before a seismic crew

10   can enter the premises to do additional work and proceed with

11   the drilling operations.

12          And needless to say, my answer was, I'm too old to go

13   to prison.  I've never done it and I have no intention of doing

14   it.

15   Q.   You've never done what?

16   A.   Bribe government officials.  It's against the law.

17   Q.   Now, stepping back, can you describe for the Court what

18   seismic work you actually did do before you were prohibited from

19   doing more?

20   A.   I bought seismic in the area, I traded seismic with Conoco

21   and with Exxon.  I then reprocessed the magnetic tapes, spent

22   the money to do the reprocessing, bringing it to modern seismic

23   interpretation, and spent money interpreting the data, spent

24   money acquiring seismic across the border in Chad, to connect it

25   to producing properties.

1    Q.  Can you give an approximation to the Court of how much the

2    market value of the seismic work that you did do and you did

3    receive from these oil companies is?

4    A.  The market value of 4,000 kilometers, when I evaluated it

5    two years ago, was $5,500 a kilometer, or $22 million.

6            In May of this year I finished seismic work onshore

7    Belize, and that cost us, RSM, $12,000 a kilometer.  Yes, it was

8    jungle versus savanna, so probably savanna would have been about

9    $10,000 a kilometer, so that would be about $40 million worth.

10   Q.  Is the seismic area in the Central African Republic jungle

11   or savanna?

12   A.  It's savanna, tall grass.  There's other dangers such as

13   tigers and hippos, but it does not have the jungle problem.

14   Q.  So how much would you estimate -- I mean, I think you had

15   indicated how you calculated it.  How much does that

16   translate --

17   A.  Well, the bids that I had two years ago were $5,500 a

18   kilometer, but prices have increased, everything has increased

19   in the oil and gas industry.  And, as I mentioned, I just spent

20   $12,000 a kilometer in the jungle area; in a savanna it would

21   have been 10,000.  So 4,000 kilometers would be about

22   $40 million worth.

23   Q.  And in your experience, is seismic information priced on a

24   per kilometer basis?

25   A.  It's on a per kilometer internationally, and it's

1   competitive bidding by seismic companies, international seismic

2   companies.  They're French, they're American, they're Canadian,

3   they're Russian, Ukrainian seismic companies.

4          THE COURT:  You're getting a little ahead of me here.

5   Can I ask -- well, can I?  Yes, I can ask a few questions to

6   clarify what is being said to me in my own mind.

7          You began by saying you acquired seismic and then you

8   manipulated it yourself.  Does that mean that there is seismic

9   information that has been collected by big oil companies or by

10  satellite or some other reason, or some other kind of

11  information that is for sale on a market?

12         THE WITNESS:  Not on the market, for trading purposes.

13  I had my own seismic in the Caribbean and I traded Conoco and I

14  traded Exxon Mobil for their seismic in Central African

15  Republic.  And I traded magnetic tapes.  Their magnetic tapes

16  were old, so I spent cash money to reprocess to bring it to

17  today's standards, because that seismic that was done there was

18  in late '70s and early '80s.

19         THE COURT:  All right.  Now, this is seismic -- you use

20  the word "seismic," but I should use the word, since I don't

21  speak this language, "seismic information" that would lead one

22  to understand where there is oil and how accessible it is.

23         THE WITNESS:  Yes.  And would you like me to define

24  what seismic is, Your Honor?

25         THE COURT:  It wouldn't hurt.

1          THE WITNESS:  May I approach the podium?

2          THE COURT:  Yes.  Why don't you move it closer?

3          THE WITNESS:  Would Your Honor allow me to use a

4     quarter and demonstrate a principle of seismic by throwing it

5     against the wall?

6          THE COURT:  My law clerks may scramble for it if you do

7     that, but sure.

8          THE WITNESS:  Seismic is based on --

9          THE COURT:  Do I need the chief judge's permission to

10    let somebody throw a quarter at the wall in a courtroom?

11         COURTROOM DEPUTY:  I'm not sure about that one.

12         THE COURT:  Go ahead.

13         THE WITNESS:  It is based on Snell's law, an English

14    physicist that developed the law of physics approximately

15    200 years ago.  It is best demonstrated when a source of sound

16    is detonated.

17         And if you follow this quarter, Your Honor , it hits it

18    in one direction and it comes out in a different direction.  If

19    you consider seismic as a multiple source of sound that hits

20    various horizons in the ground, gets reflected, we can then map

21    the horizons at different levels of the ground.  And by mapping

22    it, it tells us where there is a structure.

23         We map the various horizons, and what we're looking for

24    is what is referred to geologically as an anticline.  An

25    anticline is a given reservoir horizon that's usually a

1   sandstone but could be a limestone, and it is like a mountain

2   underground at a given level.  Oil and/or gas migrates to the

3   top and gets accumulated at the top of that anticline.

4           When one drills, one is using the seismic information

5   where to drill and penetrating various horizons - there could be

6   another horizon above - looking for that accumulation and

7   setting steel pipe to produce it.

8           There is such a thing in geophysics as a success ratio.

9   Not every anticline is productive.  So when one evaluates a

10  given concession, one uses analogies on nearby concessions

11  having the same geology, the same physical expressions.  And

12  this is exactly what I did.

13          THE COURT:  All right, sir.

14  BY MR. ABRAMS:

15  Q.  Can you just provide a little more elaboration on what a

16  success ratio is?

17  A.  A success ratio is by drilling wildcat wells -- it's an old

18  expression, where wildcats used to roam.  That means the first

19  well in a given structure, how many are successful.  Success

20  ratio is defining the success of given exploration in a given

21  area.  Customarily, it is as low as five percent, and of course

22  it could be as high as 100 percent.

23          THE COURT:  Thank you, sir.

24  BY MR. ABRAMS:

25  Q.  You had mentioned something about a $2 million payment.  And

1    I would like if you could give the Court a little more detail in

2    terms of what happened in your negotiations after the concession

3    agreement when you tried to conduct more seismic activity in

4    the Central African Republic.

5    A.  Well, I was not given permission to bring the seismic crew.

6    I had a contract arranged with a Ukrainian seismic crew, to fly

7    a crew in from the Ukraine to the northern part of Central

8    African Republic, and I was blocked.

9         And the ambassador, Mr. Touaboy, Emmanuel Touaboy,

10   said, "Well, if you want to bring the seismic crew, we need to

11   have a payment in the Swiss bank account of the Minister of

12   Energy, who is the nephew of the president, of $2 million."  And

13   that's when I told him, "I'm too old to go to prison.  It's

14   against the law."

15   Q.  And you said you were too old to go to prison to whom?

16   A.  To Emmanuel Touaboy.

17   Q.  What was Ambassador Touaboy's response?

18   A.  "Well, you don't have to make the payment; you can make a

19   payment to the agent and the agent will pay to us in a Swiss

20   bank account."

21        And I said, "Mr. Touaboy, you don't understand the law.

22   The American law is very clear.  If I know where the money is

23   going to, I'm guilty; therefore, there is no way I can make the

24   payment to your agent who will then turn around and pay it to

25   your guys."

1   Q.  And when Mr. Touaboy -- who did Mr. Touaboy indicate would

2   receive your $2 million if you had made --

3   A.  It was going to go to the Minister of Energy.

4   Q.  And who was that?

5   A.  Mr. Sylvain N'Doutingai.

6   Q.  Have you ever spoken directly with Mr. N'Doutingai?

7   A.  On telephone.  I had my people meet Mr. N'Doutingai in

8   person in Bangui, and he made it very clear to them as well that

9   until there is a payment, we cannot bring the seismic crew.  I

10  had the seismic crew representatives in Bangui three years ago,

11  and he told them point blank, Mr. Grynberg did not fulfill his

12  obligation, namely making the payment, and therefore you cannot

13  conduct seismic work in the Central African Republic.

14          And I explained, "Look, why don't you let us do the

15  seismic work, drill the wells?  You can nationalize us later

16  on."  This is a very poor country, probably the poorest country

17  in Africa.

18  Q.  You said you had your people meet with Mr. N'Doutingai in

19  person?

20  A.  Yes.

21  Q.  Which people were that?

22  A.  Mr. Sam Yahn, who is associate general counsel of the

23  Grynberg companies.  He was there.  Linda Battalora (ph),

24  another associate general counsel, was there as well.

25  Q.  And what did they specifically report back to you regarding

1    their meeting with Mr. N'Doutingai?

2    A.  If there is no payment to a Swiss bank account, seismic will

3    not proceed.

4            THE COURT:  There's nobody here to make a hearsay

5    objection, so I guess I'll allow it.

6            THE WITNESS:  I'm sorry, Your Honor.

7            THE COURT:  That's all right.

8            MR. ABRAMS:  I would argue it's a party admission,

9    but...

10   BY MR. ABRAMS:

11   Q.  Have you ever spoken with Mr. Bozize?

12   A.  Absolutely.  I met with President Bozize on two occasions.

13   I made it very clear to him that it's for his advantage for us

14   to proceed and find oil.  There is oil right across the border

15   in Chad, and I met the ambassador of Chad yesterday and he

16   informed me that they're sitting on a billion dollars in cash.

17   Q.  What did Mister -- excuse me, President Bozize -- before I

18   even get to that --

19   A.  He's the uncle of Sylvain N'Doutingai.

20   Q.  Okay.  When has President Bozize served as president of the

21   Central African Republic?

22   A.  When he overthrew President Patasse, it was in March of

23   2003.

24   Q.  And has he served as president of the Central African

25   Republic ever since?

1  A.  Absolutely.  There were a few coup attempts against him,

2  too, and his nephew was shot by a disgruntled Army sergeant.

3  Q.  This is the same nephew that's the defendant in this case?

4  A.  The same nephew.  He recovered from his wounds.

5  Q.  What was the sum and substance of President Bozize's

6  response to you when you discussed the concession with him?

7  A.  That he will straighten things out.  As he put it in French

8  to me, that he will take the dossier, that means the file, under

9  his own command.  And he never did.

10  Q.  Did you ever hear anything further from President Bozize?

11  A.  Yes, of course.  The recently retired American Embassy

12  acting ambassador has been communicating with President Bozize,

13  and the answer is, it's up to Mr. Grynberg.  Clearly saying if I

14  don't pay, I don't get in.

15  Q.  And who said it's clear to Mr. Grynberg?

16  A.  I'm sorry?

17  Q.  Who is it that said it's -- I'm sorry, my mistake.

18  A.  President Bozize said it to Jim Panos, the recently retired,

19  a year ago retired acting American ambassador.

20  Q.  And how did you hear it?

21  A.  He told it to me.

22  Q.  He being whom?

23  A.  Jim Panos.

24  Q.  And who is Elie Dote?

25  A.  He was the prime minister of the Central African Republic.

1    And he made a very similar demand to my associate general

2    counsel, Sam Yahn.

3    Q.  What was the demand that Mr. Dote made to Mr. Yahn?

4    A.  Same situation:  Mr. Grynberg has the ball in his court,

5    he's got to fulfill his obligation by making the right payments.

6    Q.  And what were the -- I mean --

7    A.  Still the $2 million payment.  The right payment has always

8    been $2 million.  At least they use dollars instead of Euros.

9    Q.  When did Mr. Yahn meet with Mr. Dote?

10   A.  Two years ago.  Two years ago summer, 2006.

11   Q.  And was that the same time he met with Mr. N'Doutingai or

12   was that a different time?

13   A.  Same time.  I met with President Bozize about a month later

14   in New York during the United Nations, in September of 2006.

15   Q.  Could that have been 2005?

16   A.  It's possible.  I met with President Bozize in 2006.  It

17   could have been the year before.  I'm sorry, I'm on painkillers.

18   Q.  And you feel okay to continue testifying?

19   A.  I'm all right.  I'm fine.

20   Q.  What other efforts have you made to resolve the issues in

21   dispute concerning your concession?

22   A.  My French attorney, Philippe Azous, A-Z-O-U-S, has been in

23   contact with a government attorney by the name of Bizon,

24   B-I-Z-O-N, this summer, as late as a month ago in Paris, and the

25   payment was demanded by Mr. Bizon of my attorney, who conveyed

1    it to me.  He said, "They want a payment."

2            I said, "How much?"

3            $2 million.

4            So no way.

5            MR. ABRAMS:  Your Honor, I would like to move for

6    Exhibit 2 to be admitted into evidence, which is the concession

7    agreement.

8            THE COURT:  I'm looking at it now.

9            This document purports to bear the signature -- it's a

10   Xerox copy.  Is it your testimony, Mr. Grynberg, that this is a

11   correct, true and correct copy of the original?

12           THE WITNESS:  Yes, sir.

13           THE COURT:  And is it your signature that appears on

14   page 39?

15           THE WITNESS:  Yes, Your Honor.

16           THE COURT:  And there are multiple signature pages, one

17   of which is signed by Andre Latou, Minister.

18           THE WITNESS:  Yes.  That was the previous Minister of

19   Energy, Your Honor.

20           THE COURT:  Another is -- and then there's another page

21   that bears the same signature, but now there's a stamp.

22           THE WITNESS:  Yes, there's a stamp, the official stamp,

23   which was stamped subsequently of the Ministry of Mines and

24   Energy, Ministere des Mines et de L'Energie.  French and Sangho

25   are the two official languages.

1           THE COURT:  Very well.  The Exhibit 2 will be received.

2           (PLAINTIFF Exhibit Number 2 was moved into evidence.)

3           MR. ABRAMS:  Thank you, Your Honor.

4           If I could ask -- I'm not moving for this to be

5    admitted, but just for demonstrative purposes I had previously

6    submitted a list of demonstrative exhibits.  I gave the witness

7    a copy and the Court a copy.

8           THE COURT:  Yes.

9    BY MR. ABRAMS:

10   Q.  Mr. Grynberg, could you turn your attention to Figure 1.

11   A.  Yes.

12   Q.  And just to give the Court a general sense of the geography

13   and the topography, if you will, what is Exhibit 1, in your

14   words?

15   A.  Exhibit 1, Your Honor, are --

16   Q.  I'm sorry, Figure 1.

17   A.  Figure 1 demonstrates in orange the sedimentary basins.

18   That's the areas where oil has been found or could be found in

19   the future in surrounding areas of Nigeria, Chad, Sudan, and

20   Cameroon.

21   Q.  And what is the basis for your testimony that oil could be

22   found in those areas?

23   A.  Because oil has been found.  There's oil right across the

24   border in Chad, what is known as the Doba, D-O-B-A, Doseo,

25   D-O-S-E-O, Salamat, S-A-L-A-M-A-T basin.

1    Q.  And can you explain to the Court what your area of

2    concession is on Exhibit 1?

3    A.  It is the area of the Doseo Salamat basin to the south of

4    the blue boundary line between Chad and Central African

5    Republic.  And just for convenience, maybe I should refer to it

6    as CRA (sic).

7    Q.  CAR, for Central African Republic?

8    A.  CRA, yes.

9    Q.  You're going to refer to Central African Republic --

10   A.  As CRA.  It will be easier for the court reporter.

11   Q.  Okay.

12   A.  And then on Figure 2 --

13   Q.  Well, let me -- can you briefly -- let's stick with Figure 1

14   for a minute.  Is it fair to say, then, that the focus of your

15   efforts in the concession area would be in those three basins,

16   Doba, Doseo and Salamat?

17   A.  Yes.  And you can actually see it on Figure 2 much better,

18   where there is in green, the dots in green are the producing oil

19   fields across the border in Chad.  The western part are actually

20   connected to a pipeline; the eastern part is to be developed

21   later on with a pipeline extension.

22       And on the right-hand side of Figure 2 is a comparison

23   to the similar basin in the North Sea of Great Britain, Norway,

24   and Holland, and a Muglad basin in Sudan is the one on the

25   right-hand side.

1    Q.  Now, why is a basin in the North Sea helpful to the Court's

2    understanding of the three basins at issue here?

3    A.  The understanding is that eventually it is fully developed.

4    You can see the green in the North Sea all over the place, and

5    the red is gas, the green is oil.  And what I'm trying to

6    demonstrate here is the potential of the Chad/Central African

7    Republic basin, that once it is developed over a period of 10 to

8    20 years, it could be as much as three million barrels a day

9    production, which is what it is in the North Sea.  Actually, now

10   it's about four million barrels a day.

11   Q.  What is the basis of making the assumption that the

12   production in the North Sea and the production in this area in

13   Africa could --

14   A.  Just the size.  The sizes are similar.

15   Q.  The size of what?

16   A.  The size of the North Sea versus the size in Chad and CAR.

17   Q.  Are you talking about the geographic size?

18   A.  The geographic sizes, yes.  Once drilling gets started and

19   continues to be developed, you're looking at a very large

20   potential.  Like the North Sea is about four million barrels a

21   day.

22           THE COURT:  Let me ask a more basic question about this

23   demonstrative, this book of demonstrative charts, graphs, and

24   very colorful things that you have presented to me now.  I would

25   love to sit and learn all about seismic exploration and

1    evaluation of and how it's done, because one of the great

2    benefits of this job is you keep learning things.

3              But it seems to me that the crux of what we have to get

4    to today is, was the contract tortiously interfered with, does

5    that make this a claim separate from a claim that according to

6    this contract would be arbitrable under the terms of the

7    contract, and if the answer to both of those questions is yes,

8    what are the damages, how much are the damages, and how are they

9    proven?

10             So frankly, based on the plaintiff's undenied and I

11   think undeniable qualifications, and his assertion that he

12   invested money and was prepared to invest more money to do

13   seismic exploration to develop oil in the Central African

14   Republic, as beautiful as this exhibit is and as interesting as

15   it is, I'm not sure we have time for it.

16             THE WITNESS:  If I may interrupt.  If you will allow

17   me, Your Honor, I can come to the chase.

18             MR. ABRAMS:  Yeah, let me just say this, Your Honor --

19             THE WITNESS:  The last page is the answer.

20             MR. ABRAMS:  I'll allow Mr. Grynberg to cut to the

21   chase, as he put it.  That's fine.  And certainly I think we

22   might be able to short circuit some of this.

23             In terms of the liability questions that Your Honor

24   raised, with Your Honor's permission, I would like to submit a

25   post-hearing brief on the issue that Your Honor just raised,

1    which is whether the pendency of an ICSID arbitration, or any

2    arbitration, for that matter, on a breach of contract claim

3    precludes a tortious interference with contract case.

4             THE COURT:  Is there an ICSID arbitration?

5             MR. ABRAMS:  Yes, Your Honor.

6             THE COURT:  Oh, okay.  Well, then, I certainly want to

7    hear more about it.  I thought you were going this route instead

8    of the ICSID --

9             MR. ABRAMS:  No, Your Honor.  The ICSID arbitration is

10   solely between RSM and the Central African Republic.  With Your

11   Honor's permission, we will submit a brief which will establish

12   as a matter of law that you can sue individual tort feasors,

13   people who are alleged to have interfered with a contract, while

14   arbitrating or even litigating separately with the contracting

15   party as to whether there was a breach or not.

16            And I would also add that one of the claims in this

17   case is a tortious interference with economic advantage claim,

18   which does not necessarily need to show a binding contract.

19            So the issues are separate, and the case can go forward

20   separate from the ICSID arbitration.

21            THE COURT:  All right.

22            MR. ABRAMS:  And I guess when we're done here, maybe

23   we'll talk about the timing of when you might want that brief.

24   BY MR. ABRAMS:

25   Q.  Mr. Grynberg, would you -- you said you wanted to cut to the

1    chase.  Would you describe for the judge your damage model?

2    A.  Well, what I would like to do, with the Court's permission,

3    is to quickly go through the exhibits, because I know your time

4    is very valuable, and come to the end and to the computation of

5    damages, if your Court will permit me.

6         THE COURT:  Go ahead.

7    A.  If you turn to Figure 3, you will see in green the

8    production very close within the same sedimentary basin, the

9    same geographic area, across the border in Chad.  And the

10   conservative estimate in Chad is about three billion barrels of

11   oil.

12   Q.  Mr. Grynberg, can you explain to the judge, what is a

13   sedimentary basin?

14   A.  A sedimentary basin is a geologic area where oil will be

15   found or could be found.  And in this case it has been found,

16   and that's Figure 1 that shows the sedimentary basins in orange.

17        So Figure 3, you will see the discoveries that the

18   pipeline will be extended.  The pipeline is in red and dashed.

19   And the existing pipeline that goes through Cameroon to the

20   Atlantic Coast is from the three oil fields that have been

21   developed in Chad and are producing roughly 250 to 300

22   thousand barrels a day, and has potentially three billion

23   barrels from those fields, not counting the new fields that are

24   in the eastern part.  The green part is the license area of RSM.

25        If you then turn to Figure 4 --

1    Q.  Just to be clear, the license area is the lighter shade of

2    green?

3    A.  The lighter shade of green, yes.

4            THE COURT:  Sort of a mustard color.

5            THE WITNESS:  Mustard color, yes, Your Honor.

6    A.  And the area in green was drilled by Exxon, or Esso, in

7    1986, and in my geophysical opinion, it didn't go deep enough.

8    It was 500 meters short, or about 1,600 feet short of making the

9    objective.  They made a mistake.

10            If you turn to Figure 4, Your Honor, you will see the

11    three large fields in Chad which are producing the 250 thousand

12    to 300 thousand barrels a day.  Even at today's prices of close

13    to $100 a barrel, you know, 300 thousand barrels a day is

14    $30 million a day.

15    Q.  Why are you using Chad as opposed to Central African

16    Republic?

17    A.  Well, because Exxon, Chevron, and Petronas, a Malaysian

18    company, have the license in Chad.

19    Q.  And do you have reason to believe that --

20    A.  The geology is the same in Central African Republic, based

21    on the 4,000 kilometers which I have studied personally.

22            If you turn to Figure 5, this is the extension of the

23    four discoveries in Chad right across the border from the

24    Central African Republic.  The border is in blue, Your Honor,

25    and the red lines in the CAR are the proposed 2,700 kilometers

1    seismic which I wanted to do in order to be closer to the

2    pipeline.  And that's what I was prevented from doing.

3            THE COURT:  When you say 2,700 kilometers, I assume you

4    mean square kilometers?

5            THE WITNESS:  No, no, Your Honor, it's linear

6    kilometers.

7            THE COURT:  So it's passes?

8            THE WITNESS:  Seismic cross-sections.  If you consider

9    a slice across the earth, that's what seismic does, just takes a

10   knife and cuts it right to 10,000 feet.  And you will see those

11   slices in just a minute, Your Honor.

12           THE COURT:  All right.

13   A.  And the green ones are based on the seismic which we have

14   already -- they indicate those prospects to be drilled, but we

15   need additional seismic to delineate it in order to be as

16   successful as one can be in the business I'm in.

17           You will then turn to Figure 6 and you will see the

18   existing seismic which we have.  And those are the dashed lines

19   in black.  And the indications of various seismic lines, like

20   CR615, CR613, are somewhat examples that I will be showing to

21   Your Honor.  There is a scale at the bottom; each block is

22   20 kilometers.  It's approximately 1.64 kilometers to a mile,

23   Your Honor.

24           And if you then continue and turn to Figure 7, you will

25   actually see a seismic line; in this case it was seismic line

1    202.

2              THE WITNESS:  And what I would like to demonstrate to

3    Your Honor, if Your Honor can look at me for a second, please,

4    is the fact that you are looking at an anticline.  This is the

5    large anticline, and those vertical lines, Your Honor, are

6    faults.  A fault is a cut across the sedimentary section and a

7    displacement of it.

8              THE COURT:  Uh-huh.  Okay.

9              THE WITNESS:  And then you will see two dots on the

10   left side, the red or orange dots.  Those are the producing

11   horizons across the border in Chad, what we call the upper and

12   lower horizons, upper and lower Cretaceous.

13             If you then turn, Your Honor, to Figure 8, you see

14   another seismic line and you see individual fault blocks, and

15   that will demonstrate with seismic data which we have in Sudan.

16   But these individual blocks, if Your Honor could look at me,

17   please, these individual blocks between faults are productive.

18   Each one can be productive here in CAR.

19             THE COURT:  Is there some significance to the fact that

20   both of these anticline charts have a green line running right

21   pretty much down the middle of it?

22             THE WITNESS:  No, Your Honor, it's just for different

23   correlations.

24             THE COURT:  All right.

25             THE WITNESS:  And if you then turn to the next page,

1    Figure 9, and if Your Honor can look at me here too, please, you

2    can see right here just garbage.  And that means it's granite.

3    And so this is sediments which are sandstones and shales coming

4    up against the granite, but there is a structure right here

5    against the fault that separates it from the granite, and then

6    there is a large structure right in here, all of which could be

7    productive in oil.

8         And if we turn to Figure 10, you will see more

9    structures.  And what I'm trying to demonstrate by these seismic

10   sections, Your Honor - and that's the new reprocessed data - is

11   that there is a tremendous potential possibility, potentially

12   could be as much as 500,000 barrels a day.

13        And then if Your Honor will turn to Figure 11, at the

14   top you will see distances for structures, like here is a

15   10-kilometer structure and here is a 10-kilometer structure, and

16   there is the anticline right on the right side and an anticline

17   on the left side, again, cut by faults.

18        Then Figure 12 is another demonstration, and there is

19   the big structure.  And it's very easy drilling, Your Honor.  It

20   takes six days to drill those wells.  That means it's not very

21   expensive.  There is another large structure right here sitting.

22        And then if you go to Figure 13, in green elliptical

23   circles are the various structures that are mapped, and that's

24   where the potential for oil and gas exists on Figure 13.

25        And then if you go to Figure 14, we have done

1    individual maps of some of the more promising structures in CAR.

2    And here, for instance, on the left side you will see a

3    potential structure with 504 million barrels of oil, and another

4    one in the lower right-hand side of 252 million barrels of oil,

5    and with seismic lines across to delineate it.

6         And if you turn to Figure 15, you will see another

7    structure with 400 million barrels of oil.  MM means -- M in

8    Latin is mille, thousand; MM is a million; BL is barrels of oil.

9         And then if Your Honor will turn to Figure 16, you will

10   see another large structure which in this case is 880 million

11   barrels.  And if Your Honor will look at the bottom right-hand

12   side, it tells you how we calculated it.  The structure covers

13   22,000 acres.  We multiply it by a typical thickness, the

14   average thickness we take from Sudan and the recovery in Sudan

15   of 200 barrels per acre foot, so we multiply barrels per acre

16   foot times the thickness in feet times the area, gives us the

17   total barrels recoverable for a given structure.

18        And if you'll turn to Figure 17, in each case there's a

19   set of computations in the lower right-hand side, and this

20   structure is good for 320 million barrels of oil.

21        And if Your Honor will then turn again to Figure 18,

22   what I would like to demonstrate is a blowup for a typical

23   structure in Central African Republic.  And we're comparing it

24   to Sudan, Your Honor, because Exxon has not released any data

25   while the operators in Sudan, specifically Talisman, a Canadian

1    company, has recently sold their interest to an Indian company

2    because there were protests in Canada for operating in Sudan.

3    And this is a Central African Republic structure.

4         If Your Honor will take a quick look at what I'm trying

5    to demonstrate, please, this is what we call a flower structure,

6    Your Honor.  The flower is blooming.

7         And the next page is a similar identical structure that

8    is producing in Sudan.  If Your Honor will take a look at

9    Figure 19, you will see a flower structure in Sudan.  And that's

10   the comparison to existing production in Sudan.

11        And then if you turn to Figure 20, it's the schematic

12   of the structure in Sudan, and the various horizons.  There are

13   11 producing horizons in Sudan, so that we can have as many as

14   11 horizons here in the various two major formations, the upper

15   and the lower Cretaceous.

16        And then if you turn again to page 21, Your Honor, you

17   will see the left side are in green.  These are the

18   oil-producing areas and the individual fault blocs that I have

19   discussed previously on a given large structure.  And on the

20   right side is an electric log showing one, two, three, four,

21   five, six, seven, eight, nine, 10, 11 producing horizons in

22   Sudan.  Maybe I should say producing reservoirs.  Same thing.

23   And these are sandstone reservoirs.

24        And then if you turn to Figure 22, it goes into the

25   details of the Unity field and the comparison which I used from

1    the Unity field in Sudan, which is published in formation, and

2    applied that comparison to calculate the recoverable oil

3    reserves in CAR.

4           And if Your Honor will then turn to Figure 23, it goes

5    through the definition of porosity.  May I approach the podium

6    to describe what porosity means?

7           THE COURT:  Sure.

8           THE WITNESS:  If you consider sandstone grains, and

9    these are enlarged grains, porosity is the pore space, Your

10   Honor, between those grains.  The green will then be porosity

11   expressed as percent of the total volume of the sandstone.

12          And just to give you one more terminology, permeability

13   is the interconnection of these sandstone grains and the ability

14   of the fluid, the oil, to flow.

15          And then within that pore space there is water, and the

16   water is usually absorbed to the surface of the grains.  So the

17   next terminology you can see is water saturation is 25 percent,

18   but then the balance, or 75 percent, is oil saturation.

19          And we used from Sudan the average of 175 feet, which

20   is 100 feet minimum, 250 feet maximum.  Then definition of an

21   acre, 247 acres in a square kilometer, and then you have

22   7,758 barrels per acre foot.  And then there's a shrinkage,

23   which is a formation volume factor, because when oil comes from

24   the ground to the surface, it shrinks because the gas that's

25   within the oil escapes.

1          And there is a typical computation of multiplying then

2     porosity times the oil saturation times the thickness to get

3     barrels per acre, and times acres we get total barrels for a

4     given prospect.

5          And then if Your Honor would please turn to Figure 24,

6     Figure 24 would have what we call a decline curve showing that

7     all the fields would be producing over a period of years.  And

8     the bottom scale is the number of years until it declines.  And

9     this decline is drawn with the limitation of the pipeline

10    capacity that's available, because it's only open pipeline

11    capacity probably for no more than 500,000 barrels a day.

12         And then when we come to the last page, the next to the

13    last page, it's the major prospects, not all the prospects.

14    There are 10 prospects that we have delineated.  The primary

15    recovery was 3,620,000,000 barrels of oil.  And then there is a

16    recovery factor, and I think that you have 90 percent success

17    ratio, and you need to substitute then, because I have cut the

18    success ratio to 50 percent.  Sudan and Chad have a 90 percent

19    success ratio, and I thought that I should be much more

20    conservative, so I have cut this down instead of 90 percent

21    success ratio to 50 percent success ratio, and that's what

22    Mr. Abrams is about to give you.

23         THE COURT:  All right.  So the bottom line is that

24    according to your calculations, the 10 top prospects in the

25    Central African Republic on which you have concessions would

1     produce, over the productive life of the well, 50 percent of

2     3,620,000,000?

3           THE WITNESS:  Absolutely, Your Honor.

4           THE COURT:  So that's about 1.8 billion barrels.  All

5     right.

6           THE WITNESS:  And using a price of oil of $80, which

7     frankly I think is conservative --

8           THE COURT:  Yeah, I would think that's pretty

9     conservative.

10           THE WITNESS:  And that's it.

11           MR. ABRAMS:  Your Honor, I do apologize.  Let me just

12     substitute Figure 25.  We did redo the figures for the

13     50 percent ratio.

14           THE COURT:  You're not going to put this in evidence

15     anyway because it's all demonstrative and confidential and all

16     that stuff.  Right?

17           MR. ABRAMS:  Right.

18           THE COURT:  So what you want me to understand is that

19     the bottom line of all of this is --

20           MR. ABRAMS:  It's the 50 percent.

21           THE WITNESS:  It's a lot of money.

22           MR. ABRAMS:  We have Figure 26, which I would like to

23     show Your Honor, which is the last figure which actually has the

24     damage numbers.

25           THE COURT:  Well, I assume that Mr. Grynberg is not

1    asking to recover $164 billion from the defendants, so there's

2    some more calculations that we need here.

3            MR. ABRAMS:  Can I pass this up?

4            THE COURT:  Yes, yes, yes.

5            THE WITNESS:  There's one more Figure 25 replacement,

6    50 percent success ratio.

7            MR. ABRAMS:  Right.  I had mentioned that to Your

8    Honor.  He understands the difference.

9            THE WITNESS:  You should have that copy of 50 percent.

10           MR. ABRAMS:  I do.  I do, but...

11           THE WITNESS:  The last one is Figure 26, are the

12   computations.

13   BY MR. ABRAMS:

14   Q.  Can you discuss, sort of take us line by line through the

15   computations and how they were done?

16   A.  Yes.  Your Honor, if you look at Figure 26, the first line

17   attributes it to a net cash flow by the end of 2009, assuming we

18   would have started to drill in November of this year, and that

19   comes out to about $36 billion.

20           We then --

21   Q.  Just so the Court knows, why did you pick November of this

22   year?

23   A.  I'm sorry, December of next year.  Because it would have

24   taken a year to develop production.  So I picked November of --

25   December of 2009.

1    Q.   Okay.  Go on, please.

2    A.   Then there is the net cash flow would have been after

3    subtracting the operating costs of drilling, completion, laying

4    an extension to the pipeline, which would be completed sometime

5    this winter, the extension of the pipeline.  So the net cash

6    flow would be 26 billion.

7         And I've taken that, discount it back to September 1,

8    2008, then I have to subtract the royalty, subtract the taxes

9    and the depletion allowance, and the fourth line from the top,

10   as of December 2009, comes down to $18 billion.

11        And when you discount it to the present net worth, it

12   is reduced to $11 billion.  And the royalty is 12 and a half

13   percent, the income tax is 35 percent, and the depletion

14   allowance is 20 percent.

15   Q.   And where are you getting your figures for the royalty and

16   the income tax?

17   A.   From the contract.  It's in the contract itself.

18        And then we use the price of oil of $80, and we cut it

19   off at 585 barrels of oil a day, using a current rate of

20   500,000 barrels a day.  And that's a recovery over a 30-year

21   period with a decline of 20 percent per year, and discounting it

22   at 10 percent to the present net worth.

23        So the net figure and net cash flow from these

24   concessions, after taxes, royalties, and depletion allowance,

25   would have been $11,753,000,000.

1    Q.  And the current price of oil roughly is what?

2    A.  I think yesterday it was $95.

3    Q.  Why did you use $80?

4    A.  Just to be conservative.  Because I think eventually, for

5    the next year or two it would be -- it could settle at $80 a

6    barrel.  But frankly, there is a shortage of oil in the world,

7    and that price is going to increase.  Because we're dependent on

8    OPEC, and OPEC can cut production and increase the price.  And

9    they already made a statement that they will never allow the

10   price to be less than 100 to 120 dollars a barrel.  You know, we

11   import about 70 percent of the oil that we need.

12   Q.  I would like to go back and ask you a couple more questions

13   about the underlying agreement and your efforts to settle the

14   agreement.  Are you familiar with a man named Earl Cherry?

15   A.  Yes.  He is another one that demanded a bribe on behalf of

16   President Bozize.  He called me up and said, "Jack, you want to

17   do additional seismic, you want to drill and find oil?  It's

18   very simple:  You give me the money and I'll take care of it."

19   Q.  How did you come to know Mr. Earl Cherry?

20   A.  I didn't know.  He picked up the phone and called me, and he

21   says, I'm the guy who has brought an airplane -- sold an

22   airplane to Mr. Bozize for Central African Republic, and the way

23   I've done it is when I have operating costs of 150,000, I make

24   it 175,000 and I give him 25,000 in cash.

25   Q.  And what was your response to Mr. Cherry?

1      A.  I says, "How can you do that?  You're an American.  It's

2      against the law."

3              He said, "Well, I go through an agent."

4              I says, "You don't understand the law.  The law says if

5      you know where the money is going, that it's a bribe, you're

6      guilty."

7              THE COURT:  Well, I've got that part, and Mr. Cherry

8      has been dismissed from the case because you don't have

9      jurisdiction -- I don't have jurisdiction over him.

10             MR. ABRAMS:  That's correct.  Because Mr. Cherry -- the

11     conversation amongst Mr. Grynberg and Mr. Cherry is relevant to

12     the case against the other defendants, that's why we're talking

13     about it.

14             THE COURT:  Well, let's continue these numbers.

15     Because I don't understand the plaintiff to be demanding

16     $11 billion, either.  There's a bottom line here somewhere, and

17     I need to get to it.

18             THE WITNESS:  Are you asking me, Your Honor?

19             THE COURT:  I'm asking one of you.  Either you ask the

20     question, Mr. Abrams, or...

21             MR. ABRAMS:  Fair enough.

22     BY MR. ABRAMS:

23     Q.  What is the bottom line calculation?

24     A.  Well, the bottom line is $11 billion.  Do they have

25     $11 billion?  The answer is no.  Do they have a lot of money?

1      Yes.  This is a country that supplies a great deal of diamonds.

2              THE COURT:  Wait a minute now.  The net cash flow from

3      this well after the expenditure of $10 billion --

4              THE WITNESS:  And discounted to present net worth.

5              THE COURT:  -- is --

6              THE WITNESS:  18.  But then discounted, it's 11

7      billion.

8              THE COURT:  Well, do you get all the oil or the royalty

9      on the oil or a percentage of the royalty?  What do you get out

10     of this?

11             THE WITNESS:  No, Your Honor.  The royalty goes to the

12     government, so I subtracted the royalty and I subtracted the

13     taxes and then I discounted to present net worth, and that

14     figure is 11 billion, 753.  And you're old enough to remember

15     Senator Dirksen.  Right?

16             THE COURT:  Yes.

17             THE WITNESS:  A billion here and a billion there,

18     before you know, you're talking about real money.  I don't think

19     Mr. Abrams is old enough to remember Senator Dirksen.

20             MR. ABRAMS:  I don't remember Johnny Cash.

21             THE COURT:  Yeah, if you don't remember Johnny Cash,

22     you're beyond recovery, Mr. Abrams.

23             All right.  What's next?

24             THE WITNESS:  Well, I'll answer the question.

25             THE COURT:  What's next?

```
 1              THE WITNESS:  Do these individuals have money?  The
 2      answer is yes.  Do they have 11 billion?  Probably not.  What
 3      they do is they get a rake-off from all the diamonds that are
 4      being mined and sold in a free market.  Central African Republic
 5      is a major diamond producer and gold producer.
 6              But what I want to do is I want to send a sign to the
 7      world that bribery is out of style.  We cannot conduct business
 8      in a free world demanding briberies.
 9              THE COURT:  How much money have you yourself spent,
10      cash out of pocket, to bring the matter this far?
11              THE WITNESS:  Probably about three or four million
12      dollars.
13              THE COURT:  What do you mean, probably about?
14              THE WITNESS:  Approximately $4 million.
15              THE COURT:  There have got to be some records of that.
16      I mean, remember, the standard here is evidence satisfactory to
17      the Court --
18              THE WITNESS:  Of course.
19              THE COURT:  And Mr. Grynberg is a distinguished fellow
20      and very believable, but "probably about three to four million
21      dollars" is not evidence of that kind of expenditures, counsel.
22      Are you going to give me anything more specific than that?
23      BY MR. ABRAMS:
24      Q.  Mr. Grynberg, we had spoken previously about seismic
25      information that you obtained from Exxon --
```

1   A.  And Conoco --

2   Q.  -- and Conoco.

3   A.  -- and the tapes, and reprocess it.

4          THE WITNESS:  Your Honor asked the question of cash,

5   but I gave Exxon other seismic and I gave Conoco other seismic.

6   It's still value.  It costs money to get the seismic, which I

7   had to give it to Exxon to give it to Conoco.  We traded seismic

8   line for seismic line, and the only way to appraise that is the

9   value of the seismic that I obtained.  And the value of the

10  4,000 kilometers -- the same thing with EnCana.  I got

11  4,000 kilometers from EnCana by giving EnCana other seismic.

12         So as to put a value, if it's all right with Your

13  Honor, the present cost of the 4,000 kilometers, and the present

14  cost of 4,000 kilometers in today's seismic cost is about

15  $40 million.

16  BY MR. ABRAMS:

17  Q.  But Mr. Grynberg, when you purchased the seismic that you

18  eventually gave to Exxon and Conoco Phillips, you were out of --

19  were you out of pocket?

20  A.  Yes.  But this was seismic that I have obtained starting in

21  1972.  Different values, different costs.

22         THE COURT:  All right.  Mr. Abrams, tell me either

23  yourself or through the witness about the ICSID arbitration.

24  What's the status of it, what's demanded, what's the claim, et

25  cetera?

1          MR. ABRAMS:  Well, from what I know, I have spoken with

2     RSM's ICSID counsel - I'm not it, but I've spoken with him -

3     there is a pending ICSID arbitration.  There has not been a

4     hearing as of yet, and I think perhaps Mr. Grynberg --

5          THE WITNESS:  May I answer, Your Honor?

6          THE COURT:  Yes.

7          THE WITNESS:  The first preliminary hearing is set in

8     French, in Paris, in December of this year.  The siting hearing

9     is going to be sometime November of 2009, and knowing ICSID, it

10    takes them at least a year to make a decision.  So probably the

11    decision is going to be the end of 2010.

12         THE COURT:  And what's the claim in the ICSID?

13         THE WITNESS:  The claim is permission to get in there,

14    explore, and produce oil and gas.

15         THE COURT:  So it's the same claim.  It's the same

16    damages?

17         THE WITNESS:  No, no.

18         THE COURT:  Why is it not the same damages?

19         THE WITNESS:  This is a cash damages case, individual;

20    the ICSID arbitration, and I'm not a lawyer, Your Honor, as I

21    understand is against the government.

22         THE COURT:  But the money you are recovering, you're

23    trying to recover on the same theory of how much you are -- of

24    the anticipated loss of return on this contract.

25         THE WITNESS:  Trying to get the concession into an

1   operation so we can recover the money, but not the money.   In

2   the ICSID arbitration there is no money involved.

3            THE COURT:  You're just basically demanding an

4   injunction?

5            THE WITNESS:  Basically an injunction so we can go in

6   and do the work, explore, drill, and produce oil and gas for the

7   next 30 years.

8            THE COURT:  And you're not asking for money damages

9   from ICSID?

10           THE WITNESS:  No, Your Honor.  We're not

11   double-dipping.

12           THE COURT:  Well, actually, if you were to recover

13   damages -- hypothetically, if you were to recover damages from

14   these three individuals for all of the profits that you would

15   recover if you were permitted to complete your seismic work and

16   go in and drill and produce, you would be double-dipping.

17           THE WITNESS:  I would just drop the ICSID arbitration.

18           THE COURT:  Oh, okay.

19           MR. ABRAMS:  Your Honor, as I mentioned earlier, we

20   would like the opportunity to brief sort of the ramifications of

21   this pending ICSID arbitration.  And before we submit a brief, I

22   would consult with RSM's ICSID counsel and make sure we have a

23   complete understanding of what --

24           THE COURT:  Well, Mr. Abrams, you've got to do much

25   more than brief this.  I mean, this is a very interesting story

1    and I'm very sympathetic to the plaintiff, but basically what

2    you've given me is an opening statement and a pro forma and a

3    business plan.  I don't have any proof of what's been spent.  I

4    have Mr. Grynberg's ipse dixit about how much money he might

5    make over 30 years, but I don't have any -- I have no proof.  I

6    just have a few sentences of oral testimony about the ICSID

7    arbitration.

8          I mean, this man is asking me to give him an award of

9    $11 billion against three individuals, and it's not going to be

10    done on an hour of testimony and a couple of charts in the

11    courtroom.  I need evidence.  And so far I have a little

12    testimony, interesting testimony, credible testimony, highly

13    qualified testimony, from a man who obviously -- and I don't

14    know if obviously is the right word, but he impresses me as a

15    truthful, qualified, sincere individual.  I'm not sure that

16    sending a message to the world about bribery is an adequate

17    legal basis for this claim.

18          But I have to worry about -- in this as in any case of

19    tortious interference with contract I've got to worry about the

20    law of tortious interference of contract, the standards of

21    proof, the speculative nature of the profit claim, which is a

22    serious problem in any tortious interference claim, but

23    particularly one of tortious interference with contract

24    advantage.  And what I have is a lot of conservative but

25    optimistic predictions about the money that might come out of

1    the ground in wells that haven't been drilled yet.

2         I need a lot more than I've been given if I'm going to

3    issue an award on a motion for default damages -- I mean, a

4    motion for a default judgment.

5         Now, I don't think I need another evidentiary hearing,

6    but I do need to have materials collected and presented to me

7    under affidavits that are a heck of a lot more precise than I've

8    been given here today.

9         MR. ABRAMS:  Very well, Your Honor.  And we would

10   greatly appreciate the opportunity to --

11        THE COURT:  There's no deadline.  You know, the

12   defendant hasn't appeared.  The defendants are in default,

13   except, by the way -- I mean, you're going to have to shore up

14   your own jurisdiction claim here, because if you get a default

15   judgment from this court, you don't have anybody to levy on in

16   this country, I don't think, do you?  You've got to take that

17   judgment to someplace and try to collect on it.

18        MR. ABRAMS:   In all probability, that's right, Your

19   Honor.

20        THE COURT:  So you don't want a half-baked judgment

21   saying, okay, fine, give him $11 billion.  I mean, that will be

22   challenged in whatever court you try to present it.  If you try

23   to levy on that judgment, in most countries there will be a

24   collateral attack on that judgment and you'll wind up with zip.

25        So you need to button this up a lot tighter than it's

1    been buttoned up in what's been presented to me.

2             MR. ABRAMS:  Very well, Your Honor.  I think we

3    understand what you're saying, and we will do so.

4             THE COURT:  Let's just call this matter adjourned, and

5    then, Mr. Abrams, you can submit supplemental material to me,

6    supplemental memoranda of evidence.  I don't really need to have

7    the seismic material, so I don't think it needs to be under

8    seal.

9             I have -- just for the record, I have reviewed the

10   material presented to me and described by Mr. Grynberg not only

11   of the seismic methods that are used but of the areas that he

12   believes could favorably be further explored and drilled for the

13   production of something on the order of 3.6 billion barrels of

14   oil over the next 30 years.  And I am -- particularly in the

15   absence of any opposing evidence, I find that that is a

16   reasonable -- that his methodology appears to be reasonable.

17            But as I say, it is essentially a pro forma and a

18   business plan, and it's not proof yet of the damages that might

19   lawfully flow from a finding of tortious interference with

20   contract.  So that's where we're going to have to leave it, and

21   it's subject to augmentation.

22            And I think you're probably in more of a hurry than I

23   am, so I'm not going to impose any deadlines on this.  It's up

24   to you when to submit it.

25            MR. ABRAMS:  Very well, Your Honor.  Thank you for your

1    time today.

2            THE COURT:  All right.  Thank you, Mr. Grynberg.  It

3    was a pleasure listening to you.

4            THE WITNESS:  Thank you, Your Honor.

5            THE COURT:  We are adjourned.

6            (Proceedings adjourned at 12:36 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Rebecca Stonestreet, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    _____          _____

10   SIGNATURE OF COURT REPORTER                 DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25