IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
JACK J. GRYNBERG and RSM PRODUCTION
CORPORATION (5299 DTC Boulevard, Suite 500,
Greenwood Village, Colorado),

                    Plaintiffs,

       -and-

ÉLIE DOTÉ, FRANÇOIS BOZIZÉ YANGOUVONDA,
SYLVAIN N'DOUTINGAI, EMMANUEL TOUABOY,
EARL CHERRY, and JOHN DOES 1-10,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

07 Civ. 1490 (JR)

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR DEFAULT
JUDGMENTS AGAINST DEFENDANTS TOUABOY, BOZIZE AND N'DOUTINGAI**

       Plaintiffs respectfully submit this memorandum of law in further support of their

Motion for Default Judgments against Defendants Francois Bozize, Sylvain N'Doutingai

and Emmanuel Touaboy (when referred to collectively, the "Defaulting Defendants").

## BACKGROUND

       The Amended Complaint dated August 27, 2007 alleges three causes of action

against each of the Defaulting Defendants – (1) tortious interference with contract

(Amended Cpt. at 67-78); (2) tortious interference with economic relations (Amended

Cpt. at 79-82); and (3) civil conspiracy (Amended Cpt. 83-87).  Plaintiff Jack J. Grynberg

("Grynberg") is a Colorado resident, and Plaintiff RSM Production Corporation ("RSM")

is a Texas corporation with a principal place of business in Colorado.

In June of 2008, upon the Defaulting Defendants' failure to appear, Plaintiffs filed

Motions for Default Judgment with respect to the Defaulting Defendants.  Plaintiffs

hereby incorporate their initial memorandum of law in support of the Motion for Default

Judgment, which, *inter alia*, discussed the service of process related to the Defaulting

Defendants and the applicable laws and legal standards governing service and defaults.

See Docket Entry # 23, Filed June 16, 2008.

On October 3, 2008, Grynberg testified in support of the Plaintiffs' motion for a

default.  Grynberg is the individual Plaintiff and Chief Executive Officer of RSM.  The

transcript of that testimony is attached hereto as Exhibit 1.  During the course of the

October 3 proceeding the Court welcomed a post-proceeding submission in further

support of a default judgment.  This Memorandum of Law, along with the accompanying

Affidavits of Grynberg and Robert D. Pelo, provide further support for a default

judgment against the Defaulting Defendants.

## **APPLICABLE STANDARD**

The Defaulting Defendants are or were at relevant times Officers or Ambassadors

with the sovereign nation of the Central African Repubic ("CAR").  The applicable

defaulting provision in the Foreign Sovereign Immunities Act (28 U.S.C. 1608(e))

requires the proponent of a default against an instrumentality of a sovereign state to

provide evidence "Satisfactory to the court" of his right to relief in order to obtain a

default.  The "Satisfactory to the court" standard may be based upon sworn affidavit

testimony and does not require an evidentiary hearing.  See Ben-Rafael v. Islamic

<u>Republic of Iran</u>, 2008 WL 485091 (D.D.C. 2008).  A Court is entitled to take plaintiff's

uncontroverted affidavit evidence as true.  <u>Id.</u>  It follows, of course, that the Court may

also rely on sworn testimony provided in open court.

**I.        THE PENDING ARBITRATION BETWEEN RSM AND CAR DOES NOT PRECLUDE THIS CASE**

During the October 3 proceeding, the Court inquired about the impact in

which the International Centre for the Settlement of Investment Disputes ("ICSID")

arbitration pending between RSM and CAR will have on the viability of this case.

Exhibit 1, Tr. at 29:4-8.  This issue will be addressed now.

This case and the arbitration overlap primarily on one issue – whether CAR

breached its exclusive contract with RSM.  RSM is confident that the ICSID tribunal will

find that CAR is in breach.  However, there is no resolution of the arbitration that will

foreclose this lawsuit.  Defendants' conduct in tortiously interfering with the exclusive

RSM contract, interfering with the economic relationship, conspiring to interfere with the

contract and relationship, and seeking to make CAR's continued performance and

willingness to do business with RSM dependent upon the payment of bribe money are not

being litigated in the arbitration.  Thus, the identity of issues is limited.

Moreover, the fact is that Plaintiffs could not have sued the Defaulting

Defendants in ICSID or any other arbitral body.  There is no ICSID jurisdiction for a

tortious interference claim against an individual official of the CAR.  Article 25(1) of the

ICSID Convention states that the jurisdiction of ICSID**:**

> shall extend to any legal dispute arising directly out of an investment, between a
> Contracting State (or any constituent subdivision or agency of a Contracting State
> designated to the Centre by that State) and a national of another Contracting State,
> which the parties to the dispute consent in writing to submit to the Centre.

The term "Contracting State" does not include individual officers or representatives of any government.  Absent express authorization from the government of CAR, RSM could not have instituted any ICSID proceeding against any of the Defaulting Defendants.  "No jurisdictional basis for ICSID exists unless the Contracting State provides written consent designating an entity as a constituent agency or subdivision."  See "The International Bank For Reconstruction And Development And Dispute Resolution: Concilating And Arbitrating With China Through The International Centre For The Settlement Of Investment Disputes."  24 N.Y.U. J. Int'l L. & Pol. 439, 461  (1991).  Having no arbitral forum to which to litigate these claims, Plaintiffs had to either litigate or abandon the claims.

At the same time, RSM was required to arbitrate any claims against the CAR, pursuant to Article 29 of the parties' Concession Agreement.  October 3 Tr. Exh. 2 (Concession Agreement) at 37.  Thus, the contractual claims against CAR cannot be litigated in any non-arbitral forum, nor prosecuted in the same case as the tortious interference and conspiracy claims against the Defaulting Defendants.  As a result, RSM was forced to bring claims in separate forums, arbitrating against CAR, and instituting an action in this Court against the Defaulting Defendants.

There is nothing improper or even unusual about litigating a breach in a forum separate from a forum considering tortious interference issues.  As Judge Posner has observed, "there is no rule that you cannot sue the interferer without also suing the party to your contract whom the defendant inveigled into breaking the contract."  Salton, Inc. v. Philips Domestic Appliances and Personal Care B.V., 391 F.3d 871, 880 (7th Cir. 2004).  Both parties to a contract are not necessary parties in a tortious interference action where

one of them sues the alleged interferer. <u>See</u> <u>Arkansas v. Texas</u>, 346 U.S. 368, 370 (1953)

(corporation that had entered into contract with plaintiff was not an indispensable party in

plaintiff's action against defendant for tortious interference with that contract, even

though there was a related case pending between the contracting parties).

Moreover, such cases may move forward simultaneously, despite some overlap in

the issues.  As discussed above, tortious interference with economic relations claim does

not require a valid contract.  <u>See</u> <u>Cronk v. Intermountain Rural Elec. Ass'n</u>, 765 P.2d 619,

623 (Colo.Ct.App.1988).  Because there is no requirement that plaintiff prove a breach of

contract in order to prove tortious interference with economic relations, Courts have

permitted such tortious interference claims to move forward in cases where there are

contemporaneous pending proceedings related to the underlying contract.  <u>See</u> <u>Michele</u>

<u>Pommier Models, Inc. v. Men Women N.Y. Model Management, Inc.</u>, 97 Civ. 6837,

1997 WL 724575, 4 N.2 (S.D.N.Y. Nov.18, 1997) (denying motion to dismiss in tortious

interference case where question of whether there was an underlying breach was being

litigated in Florida); <u>Richmond Valley Products, Inc. v. St. Paul Fire & Marine Ins. Co.</u>,

1995 WL 675598 (W.D. Wis. 1995) (motion to stay denied – appeal of breach of contract

case will not resolve tortious interference case); <u>Meldeau Intern. Inc. v. Goodyear Tire &</u>

<u>Rubber Co.</u>, 750 F.Supp. 1574 (S.D. Fla. 1990) (court would not stay case pending

arbitration of the contract claim because plaintiff would have a cause of action for

tortious interference regardless of the outcome of the arbitration).

In summary, given (1) the substantial differences in the issues raised in this case

versus the ICSID arbitration, (2) the fact that the contract case against CAR needs to be

arbitrated, while the claims herein could not have been, (3) the well settled law permitting

tortious interference claims to move forward notwithstanding related litigation on issues

pertaining to breach of contract, and (4) the Defaulting Defendants' failure to appear and

raise any arguments to the contrary, Plaintiffs respectfully request that the Court consider

the merits of their claims.

> **II.     PLAINTIFFS HAVE PROVIDED UNCONTROVERTED PROOF OF THEIR CLAIMS AGAINST THE DEFAULTING DEFENDANTS**

Tortious interference with contract requires proof of improper interference with

the performance of a contract between plaintiff and a third party, causing the third party

not to perform, and resulting in pecuniary loss.  Restatement of Torts § 766; Comtrol,

Inc. v. Mountain States Tel. & Tel, Co., 32 Colo.App. 384, 513 P.2d 1082 (Colo. App.

1973).[1]  Defendant's knowledge of the contract is also an element of the tort.  Id.

The elements are similar for tortious interference of prospective business

advantage, with two significant differences.  First, there is no requirement that Plaintiff

plead or prove the existence of a valid contract.  Second, there is the additional

requirement that the interference be improper.  In Colorado, "the crucial question in

determining liability for tortious interference with prospective financial advantage is

whether defendant's interference was intentional and improper." Cronk v. Intermountain

Rural Elec. Ass'n, 765 P.2d 619, 623 (Colo.Ct.App.1988). This inquiry tracks the

language of Restatement of Torts § 766B, which states that "[o]ne who intentionally and

improperly interferes with another's prospective contractual relation ... is subject to

liability to the other for the pecuniary harm resulting from loss of the benefits of the

---

[1]     Colorado law is presumed here, as Plaintiffs are Colorado residents.  Moreover, the Contract with CAR was signed by RSM in Colorado.

relation."  See Also Amoco Oil Co. v. Ervin, 908 P.2d 493 (Colo. 1995); Dolton v.

Capitol Fed. Sav. & Loan Ass'n, 642 P.2d 21 (Colo. App. 1981).

 The civil conspiracy cause of action is a means to extend liability to individuals

who acted in concert to commit a tort.  See Morrison v. Goodspeed, 100 Colo. 470, 484,

68 P.2d 458 (Colo. 1937) (Colorado Supreme Court rules that if a conspiratorial

"agreement and concert of action resulted in damages…it is such result that constitutes

[the] cause of action, and it is good as against all who participated in producing it.").

 The facts, as demonstrated by Mr. Grynberg's testimony, are relatively simple.

RSM had a Concession Agreement with CAR.  Tr. Exh. 2, hereto.  A concession "is a

right to explore for oil and gas to be recovered over a specific area; subsequently, the

right to explore is automatically converted to a right to produce oil and gas subject to the

terms of such a concession."  Tr. 11:12-15.  The Concession Agreement was negotiated

by Grynberg on behalf of RSM with CAR's then-president, Mr. Felix Patasse, and

entered into in November of 2000.  Tr. 12:19-25.

 Once the Concession Agreement was signed, RSM conducted seismic survey

operations throughout the northern part of CAR.  The area covers 14.5 million acres, as

well as seismic information for the area across the area in Chad.  RSM focused on

approximately 60 drillable prospects.  Tr. 13:5-10.  RSM was set to benefit from a $1.6

billion dollar adjacent pipeline that was operated by Exxon Mobil and financed by the

World Bank, which has a potential operating capacity of 850,000 barrels a day but is

operating now at approximately 250,000 to 300,000 barrels a day.  Tr. 13:15-25.

 Unfortunately, the CAR's leadership changed due to a coup d'etat in March of

2003. Tr. 14: 4-8.  The new President, through Defendant Touaboy, demanded from

Grynberg a $2 million bribe to be paid in Switzerland before any RSM seismic crew would be permitted to do additional work and proceed with the drilling operations.  Tr. 14:6-11; 19:9-14.  Grynberg categorically refused to provide any bribe money.  Tr. 14:12-14.  RSM had previously contracted with a Ukrainian seismic crew to fly in from the Ukraine to the northern part of the CAR, but RSM was blocked from doing further work in the area.  Tr. 19:1-8.

Defendant Touaboy asked Grynberg that the payment be made to CAR's Minster of Energy, who at all relevant times has been Defendant Slyvain N'Doutingai.  Tr. 20:1-5.  Mr. N'Doutingai made clear to Grynberg and other RSM officials that RSM was prohibited from bringing in a seismic crew into CAR until there was actual payment.  Tr. 20:6-21:3.

Grynberg has discussed a resolution of this impasse with Defendant Bozize. 22:5-23.  Bozize is President of the CAR and the uncle of Defendant N'Doutingai. Bozize has confirmed that resolution the impasse is "up to Mr. Grynberg," meaning that if Mr. Grynberg does not pay the $2 million bribe, RSM will not be able to resume its activities within the CAR.  Tr. 22:11-14.  Subsequently Earl Cherry, the owner of an aviation company, contacted Mr. Grynberg and demanded a bribe on behalf of Mr. Bozize, as a condition to Grynberg's ability to do additional seismic work.  Tr.42:12-43:6.

Thus, the Defaulting Defendants have all advised Plaintiffs that the cost of CAR continuing to perform their end of the Concession Agreement, and the cost of continuing to do business in the CAR pursuant to that Concession Agreement, is the payment of an illegal $2 million bribe to CAR government officials that was of course never

contemplated in the Concession Agreement.  The illegal *quid pro quo* proposal that each

of these Defendants suggested to Mr. Grynberg -- essentially either pay the bribe or CAR

will not honor the Concession Agreement -- meet the elements of each interference tort.

Each of these Defendants were aware of the Concession Agreement and of Plaintiffs'

prospective relationship with the CAR (otherwise the negotiations testified to above

would have made little sense), each of the Defendants attempted to recover bribe money

and threatened the CAR's non-performance and refusal to allow RSM to continue its

work in the CAR as a penalty for not paying the bribe, and it is this refusal to allow RSM

to continue its work in the CAR that has caused RSM to suffer damages.

### III.           PLAINTIFFS HAVE SUBMITTED ADEQUATE AND UNCONTROVERTED PROOF OF THEIR DAMAGES

The Affidavits of Grynberg and Controller Robert Pelo outline RSM's out-of-

pocket losses.  Pelo Affidavit at ¶¶ 2-3; Exh. A thereto; Grynberg Affidavit at ¶¶ 4, 11-

12.  These Affidavits show cash losses of $6,258,159.00.  The majority of this is

supported by actual paid invoices to third parties, except for the professional salary costs

noted in Schedule 1 to Mr. Pelo's Affidavit.  Mr. Pelo describes how these costs were

allocated in Paragraph 2 of his affidavit.

In addition, Mr. Grynberg has explained in detail the extremely valuable nature of

the seismic materials in which he and RSM bargained and traded for during the course of

RSM's efforts to do business in the CAR pursuant to the Concession Agreement and

economic relationship between RSM and CAR.  Grynberg Aff. at ¶¶ 3, 6-10; Tr.14:17-

16:18.  The fair market value of this data is $42,000,000.  Grynberg Aff. at ¶10.

Combined with the out-of-pocket losses, damages would be $48,258.159.00.

Finally, Mr. Grynberg has calculated potential damages of $11.75 billion based on a model that he detailed at the hearing.  Grynberg Affidavit at ¶ 12; <u>See</u> <u>Generally</u> Exh. 1 hereto Tr. 30:7-45:8.  The Court indicated that the model was probably too speculative to support a finding in damages.  Assuming the Court finds this model too speculative, Plaintiffs request that the Court award Plaintiffs $48,258.159.00.

Dated: November 3, 2008

By:_____

Daniel L. Abrams
Law Office of Daniel L. Abrams, PLLC
2 Penn Plaza, Suite 1910
New York, NY 10121
(212) 292-5663

Attorney For Plaintiffs
*Pro Hac Vice* Admission